526 So.2d 609 (1987)
Ex parte Preston BRANCH.
(In Re Preston Branch
v.
State of Alabama).
86-500.
Supreme Court of Alabama.
September 18, 1987.
As Modified on Denial of Rehearing December 4, 1987.
*610 L. Dan Turberville, Birmingham, for petitioner.
Don Siegelman, Atty. Gen. and Beth Slate Poe, William D. Little, Asst. Attys. Gen., for respondent.
Bryan E. Morgan, Executive Director, Alabama Dist. Attys. Ass'n, amicus curiae on behalf of district attorneys in State of Ala.
MADDOX, Justice.
This petition for certiorari presents a case of first impression involving the State's use of its peremptory challenges to strike 6 of 7 blacks from the jury venire. The specific question presented is whether the State's explanations of the reasons for its exercise of the challenges were racially "neutral." In determining this question, we must review, in detail, the holding of the Supreme Court of the United States in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and our holding *611 in Ex parte Jackson, 516 So.2d 768 (Ala. 1986).
Because the Supreme Court of the United States did not "formulate particular procedures to be followed," and did not "instruct the [state and federal] courts how best to implement [the Batson ] holding,"[1] and because the trial judge, in this case, did not have the benefit of any guidelines formulated by the Supreme Court of the United States in Batson, or by this Court in the case of Jackson, we do not, at this time, affirm or reverse the judgment of the Court of Criminal Appeals, but we remand the case to the Court of Criminal Appeals, with directions to remand it to the trial court for a new determination of the issue raised by the petitioner, based upon the guidelines we delineate in this opinion, and based upon the rule of law contained in Jackson.

FACTS
The facts of this case are very ably set out in the opinion of the Court of Criminal Appeals, and while we could make reference to that opinion for the statement of facts, we believe that for a better presentation of the issue in this case, we should, and do, recite the facts, as found by the Court of Criminal Appeals in Branch v. State, 526 So.2d 605 (Ala.Crim.App.1986):
"The appellant, Preston Branch, was indicted and convicted for the offense of murder, as proscribed by § 13A-6-2, Code of Alabama 1975. He was subsequently sentenced to imprisonment for life.
"As his sole issue, Branch, who is black, contends that the trial court denied his motion for mistrial or for new trial on the assertion that the prosecutors' use of their peremptory strikes to remove members of his racial group from serving on the petit jury violated the Equal Protection Clause. We review the trial court's ruling with the guidelines of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 [90 L.Ed.2d 69] (1986), which was released just five days prior to Branch's trial. In Batson, the Supreme Court substantially changed the evidentiary burden, previously set forth in Swain v. Alabama, 380 U.S. 202 [85 S.Ct. 824, 13 L.Ed.2d 759] (1965), placed on a criminal defendant who asserts an equal protection claim based on the prosecutor's alleged racially discriminatory use of peremptory challenges. Fleming v. Kemp, 794 F.2d 1478, 1483 (11th Cir. 1986).
"We must apply the principles of Batson to the particular circumstances of this case, which are as follows: On May 6, 1986, after voir dire examination of the petit jury venire and after the prosecution exercised its first three strikes to strike blacks, Branch's counsel interrupted,
"`I believe based on my experience with this government prosecutor, Mr. Nelson, he had a record of using his preemptory [sic] challenges to rid the venire of blacks.
"`I had one three weeks ago, he used all seven strikes to eliminate blacks. And in light of Batson v. Kentucky, I believe the defendant is being denied Fifth, Fourteenth and Sixth Amendment rights to right of a fair trial by this prosecutor, systematically exclusion of black people.'
"The trial court responded, `Well, I have tried many cases with the two prosecutors, I can't agree that in my experience it is systematically excluding blacks.' In *612 addition, the court required the prosecutors to make note of their reasons for their strikes and, if a conviction resulted from the trial, Branch's contention would be resolved in a motion for new trial. Defense counsel made no objection to this procedural arrangement.
"Immediately after the jury rendered its verdict on May 8, defense counsel moved for a mistrial. Thereafter, the court examined the jury selection within the context of Batson. The parties stipulated that the prosecution exercised six of its seven strikes to exclude six of the seven blacks included on the venire. Then, the two prosecutors gave specific reasons for striking each particular venire person, which are summarized, as follows:
"`HARRIS: One of the prosecutors participated in a "bust" five months before, at a home close to Harris's residence, and saw Harris during the "bust"; he could not recall Harris's relationship to the person arrested, so he thought it best to strike him. Moreover, Harris was similar in age and physical appearance to Branch.
"`MAYNOR: As an employee of Gold Kist, Maynor was not desirable as a juror because it is the prosecutors' general experience that Gold Kist's employees have not been attentive as jurors and a number of employees are being investigated for a variety of crimes.
"`MEADOWS: Meadows's background as an unemployed, former student was not attractive, and she "appeared... to have kind of a dumbfounded or bewildered look on her face, as if she didn't know why she was here, or what she was supposed to do."
"`MONTGOMERY: Being a scientist, Montgomery's presence on the jury would have put too great a burden on the prosecution, considering the background of the case and "knowing the problems with one hundred percent mathematical aspects of a case like this"; the prosecutors did not want a "scientific application in the decision."
"`PARMER: Parmer's general appearance was unkempt. Moreover, he worked in "credit management," and because the prosecutors were not able to question him about his specific job, they deemed it too risky to leave Parmer on the jury. Parmer appeared to be a gruff collector and the prosecution did not want a juror who would be at odds with anyone else on the jury.
"`KELLEY: As a single female who was about the same age as Branch, Kelley "might feel as though she were a sister, or that type thing and have some pity on the person." Moreover, Kelley was observed frowning and the prosecutors did not want, on the jury, a person who was in a bad mood. Finally, her response to defense counsel was much more favorable than her response to the prosecutors.'
"After hearing these explanations, the court noted that it considered the prosecutors to be credible and that it trusted them when they stated things in their capacity of court officers. The court then reserved ruling on Branch's motion for mistrial.
"On May 23, another hearing was held on the Batson contention, as presented in Branch's `motion for new trial or for mistrial.' After the court heard further argument, the court denied Branch's motion."
Because of our in-depth treatment of this issue, we quote additional portions of the record, which contains a transcript of what occurred relating to the peremptory challenge issue:
"MR. TURBERVILLE [defense counsel]: [Batson was] not talking about striking all blacks. [It talks] about striking any black member from jury duty because of race.
"... Batson very clearly says that [the State] must give a neutral reason or believable reason for striking. They used their first six strikes to strike blacks ... even an insurance adjustor, conservative-type biochemistry person, an old woman that
"THE COURT: Before we get into the facts, [Mr. Turberville], read the third paragraph *613 [from Batson].... I think that is very instructive.
"MR. TURBERVILLE (reading): `A defendant may establish a prima facie case of purposeful discrimination solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. The defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. The defendant may also rely on the fact that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that such facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the veniremen from the petit jury on account of their race. Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. The prosecutor may not rebut a prima facie showing by stating that he challenged the jurors on the assumption that they would be partial to the defendant because of their shared race or by affirming his good faith in individual selections.'
"Judge, I believe that I met that test.... We pointed out it was a black defendant. I pointed out that their first three strikes had been black. I pointed out that just three weeks or so ago, I had a case with Mr. Rod Nelson where he used all of his peremptory strikes to eliminate blacks when it was a black defendant.
"THE COURT: All right. Out of perhaps more caution than anything else, I am going to require you State lawyers to explain why you selected these persons for peremptory strikes.

"MR. TURBERVILLE: Judge, may I make a motion here also?
"THE COURT: Yes.
"MR. TURBERVILLE: I think this is kind of like locking the barn door after the cows are out. Batson says that once I make that showing, and I did make that showing before the trial even started, during the selection of the jury and I asked you to do something about it then, I asked you to stop it. And I also objected after each additional black person was eliminated.
"I think that we have gone too far, and I believe a mistrial is in order. And anything that they do, knowing theseyou know, three days that they were going to have to do this, Judge,it gives them an opportunity to go ahead and come up with neutral reasons, which they didn't have at the time they struck them, Judge.
"It is apparent to all with any common sense whatsoever, that they were striking these people purely because of their race....
"THE COURT: How was I to know that the next three strikes would be black persons?
"MR. TURBERVILLE: I objected each time, your Honor....
". . .
"MR. NELSON [counsel for State]: Your Honor, we just want to state for the record that at the time that we had this conference in your office, that we stated for the record, and we want to state again, that none of our strikes were based on any racial prejudice, or none of the strikes were based on racial reasons.
"What we would like to do at this time, then, is state for the record the reason we had then, and it's the same reason we have now. We haven't done any additional research about these people. These are the reasons we had at the time, we wrote them down pursuant to your request that we should. And we would like to each give our reasons. I will give a reason first and then [Mr. Wallace] will for each person.
"I believe our first strike was 122, Mr. Harris. Mr. Harris was from East Thomas. I personally was on a bust about five months ago at a home close by Harris. In fact, I think on that occasion, Mr. Harris saw me and I saw him late one evening out in that area, part of town, East Thomas, and I thought that I recognized him. And *614 because I didn't know or could not recall his involvement at that time having seen him, whether he was the brother or whether he was a relative of the person that we busted for the drugs, I felt it best that we strike him.
"MR. WALLACE [counsel for State]: As to Mr. Harris, your Honor, I agreed with Mr. Nelson that we should strike him. The reason I had marked on my sheet was that he washe appeared to me to be near in age and overall appearance to the defendant, not counting the fact that they were both black.
". . .
"MR. NELSON: 194 was our next strike, Mrs. Maynor. Mrs. Maynor works for Gold Kist. And my general experience has been that those people coming from that company, for whatever reason, do not make good jurors. And theyin fact, it has been my experience in the past, I have had several that have worked at Gold Kist that I have left on, and they have not been attentive [and] all of them have not been black.
"MR. WALLACE: Judge, as to Maynor, I had already marked on my sheet and agreed with Mr. Nelson that because of the employment at Gold Kist, that this juror should be struck. It has been my experience that I have seen a number of investigations where persons who were employed at Gold Kist are being investigated for a variety of different crimes. And I did not want somebody from that work background on my jury.
"MR. NELSON: Our next strike was 201, Mrs. Meadows. Mrs. Meadows had been a student and was now unemployed and [I] felt like that since she had been in school and now she was unemployed, that that was a risk to leave her on. We didn't feel like we wanted someone with that particular type background; student, and being unable to get a job.
"MR. WALLACE: As to Meadows, I agreed with Mr. Nelson that Meadows should be struck, because in my personal observation of Meadows during voir dire, Meadows appeared to me to have kind of a dumbfounded or bewildered look on her face, as if she didn't know why she was here, or what she was supposed to do.
"MR. NELSON: 204 was our next strike, Mr. Montgomery. Mr. Montgomery was a scientist, knowing the background of this case, and knowing the problems with one hundred per cent mathematical aspects of a case like this, we did not feel like that it would beor I did not feel like it would be appropriate to leave someone who may have a tendency to measure this in a scientific way; and felt like that that [sic] would have resulted in too great a burden for us. So, we struck him.
". . .
"MR. WALLACE: 204, Montgomery. As to Mr. Montgomery, I agreed with Mr. Nelson that he should be struck for that very same reason, in that he is a scientist, and we didn't want a scientific application in the decision of this case.
"MR. NELSON: Our next strike was Number 218, Mr. Parmer. Mr. Parmer worked with a creditinvolved in credit management. And we felt like, first of all, his general appearance to begin with was unkempt, he was not neat. And next, his background of dealing in credit, it has been my experienceand there again, without the ability to go into specifically his background of what area of credit he was involved in, whether it was the application, management of people coming in to him for credit, or what area, I thought it was too risky to keep somebody on there with that type background, without being able to go into it. And if you go into it, then you embarrass a person, perhaps, toso based on the fact of no other responses, and not really getting any more insight into background, I felt like it was too much of a risk.
"MR. WALLACE: As to Mr. Parmer, I agreed with Mr. Nelson that Mr. Parmer should be struck. Because to me, he had kind of a gruff, collector-type appearance, as opposed to credit management. And I didn't want a person on the jury who I thought was going to be at odds with anybody else on the jury.
*615 "MR. NELSON: [Finally,] Ms. Kelley, 162. Ms. Kelley was single, and in my opinion, she fell into about the same age category as the defendant. And the possibility that if she did, and being single, that she might feel as though she were a sister, or that type thing and have some pity on the person. And I felt like she should be struck for that reason.
"MR. WALLACE: As to Kelley, I agreed with Mr. Nelson that Kelley should be struck, because the times that I observed Kelley, Kelley was frowning. Again, I didn't want a person in a bad mood on the jury.
"We should also point out that these are six of our strikes. The seventh strike was for Number 51, a man named Coughlin, who is a white man.
"MR. NELSON: Also, I would point out, [Mr. Wallace] reminded me, Ms. Kelley, throughout almost the entire time that I was asking questionsand this is going to get into some body language, your Honor, which we are entitled to look at and evaluateshe had her handsshe was totally closed to me. And in contrast, when [Mr. Turberville] was up asking questions, her arms were open and that is another part of it.
"Mr. Dan Turberville, the defense attorney, when he was up, she was open and answered questions a little bit more frankly; or even had a response. Didn't have any response to mine.
"THE COURT: All right. [Mr. Turberville], you have the floor.
"MR. TURBERVILLE: Judge, [i]f you believe that junk and if you uphold this jury, what you are saying to Batson [is that] the [Justices of the] Supreme Court wasted their time. [The State] can say any juror that holds his hands across his chest, or has his hands down, that represents closed and open.
"... [I]f you are going to [accept] that, then that just gives the government prosecutors, who have been living a lie so long that they now believe that they have never done anything wrong as far as discriminating against blacks, a license to come in and give you some junk like they just gave you.
"They talk about the one person from East Thomas. Are we saying that if you live in East Thomas, you may live near a criminal; so therefore, you can't be on a jury? We know that the juror himself wasn't charged with a crime. You asked them if they had been charged with a crime and if they were convicted and so forth and so on. We asked them about relationship with the police and the District Attorney and so forth.
"You know, it would be so easy for this prosecutor or any prosecutor, to come in and say, `I was out on a bust wherever, and I thought I might have seen that man, and I can't remember what his involvement may have been.' Judge, that is ridiculous.
"All right. We go to Gold Kist. And I think that the people at Gold Kist ought to know that they are not eligible for jury duty in the City of Birmingham, Jefferson County. This prosecutor has just said it, that they don't want people from Gold Kist to serve on juries. Now, he said that. And I hope they quote him in the newspaper. I hope it goes just like that, because that is what is in the record. We don't want Gold Kist people serving on juries. Virtually, everybody at Gold Kist, short [of] a few white supervisors just poor old people that just can't find anything else, are black. And I think you can take judicial notice of that if you want to.
"Talking about this lady that gave the different body English, Number 162. She is an insurance adjustor. Every defense attorney knows that one person you get off a jury, if you can, is an insurance adjustor. They are almost a hundred per cent prosecution oriented, and they know that.
". . .
"They eliminated one person because they had a frown on their face. You're going to give themthat can be a reason? Then forget about Batson, because all you have got to do is come in and say, `I noticed that the juror had a frown on their face and looked like they had rather be somewhere else.' It is making a mockery of Batson.
*616 "They have lived a lie too long, Judge. They believe it. Those two believe, and all these people down here believe, one hundred per cent, that we never strike blacks because they are black. And that is the biggest lie that I have ever seen in my lifetime. And it's a lie right here in this court, and you heard those answers, Judge. You heard them. And it is going to take courage to say, `me and you have messed up, and this is the law in the United States of America now, and it was changed last week.'
"You heard him, Mr. Nelson, saying early, `Why don't we follow the law that was in Alabama? We haven't got that opinion yet. Let's go by the law in Alabama.' That shows where he was coming from, Judge. We haven't got the opinion yet. We know under Swain we can do anything we want to, so we're going to do it.
"Judge, I did all I could at the start of this trial to stop that; to give this man a fair trial. And again, they left a person on that knew me, knew my partner, and on and on.
"THE COURT: The bankruptcy girl?
"MR. TURBERVILLE: Yes, sir, lawyer. And the one white they strucklet me say thisthe one white that they struck was a person that made it quite clear that he didn't like police and he didn't like the D.A.; even his mother had been arrested on some false charge. And he hadn't got the District Attorney to do anything about [it]. So, they had to eliminate him. He obviously wasn't going to go for them, no matter what the circumstances.
"THE COURT: [Mr. Turberville], as always, I am not cutting you off, but I am impressed with your sincerity, but I can't help but to remark that these men, Nelson and Wallace, are court officers, just like you are. And they stand here, Wallace, especially, has been in here, I guess for two years. And I think they are credible persons. I trust these men when they tell me something as court officers.

". . .
"MR. TURBERVILLE: We're talking about the fact thatthere were seven blacks. They used their first six strikes over my objection to eliminate blacks. The reasons they have brought in are so frivolous that they hinge [sic] on the ridiculous.
"Judge, what you are doing is giving them a license to just stomp on Batson. That is all it is, if you uphold this. That is what you are saying, come in, give me any excuse other than race, and there is not one D.A. in the country that will say, `Judge, I eliminated him because he was black and the defendant was black.' He is going to say because he had his hands drawn, because he was frowning, because his clothes were messy." (Emphasis added.)

THE SCOPE OF THIS OPINION
In this opinion we will set forth our understanding of the Batson decision, and the procedures that we believe must be followed to implement it, the specific role of the trial judge in the process, and the scope of appellate review of the trial court's determination. In establishing these procedures, we will set forth the following: the history of the law in Alabama relating to the drawing, summoning, selection and empanelling of juries in criminal cases; the history of the development and use of peremptory challenges in Alabama; and the statutory procedure used for the selection of petit juries in criminal cases. We will also set forth the showing required by a defendant in order to raise a Batson challenge; the role of the trial judge in determining whether a sufficient showing has been made; the responsibility of the prosecutor to establish race neutral reasons if a prima facie case is made; and the role of the trial judge in determining, in each particular case, whether the prosecutor has satisfactorily shown that the state did not use its peremptory challenges to exclude persons from the petit jury on account of their race.

HISTORY OF THE DRAWING, SUMMONING, SELECTION, AND EMPANELING OF JURIES IN ALABAMA
Alabama has for many years statutorily regulated the procedures for drawing, summoning, *617 selecting, and empaneling both grand and petit juries in criminal cases. See Title 12, Chapter 16, Code 1975, § 12-16-1 through § 12-16-233. Of particular significance, insofar as this particular case is concerned, is the procedure provided for by Code 1975, § 12-16-100:
"§ 12-16-100. Drawing, selection and empaneling of juries in criminal cases Generally.
"(a) In every criminal case the jury shall be drawn, selected and empaneled as follows: Upon the trial by jury in the circuit courts of any person charged with a felony, including a capital felony, a misdemeanor, or violation, the court shall require a strike list or lists to be compiled from the names appearing on the master strike list as established in section 12-16-74. In compiling the list or lists, names of qualified jurors may be omitted on a nonselective basis. A strike list shall be furnished for the trial of any case at hand and a copy thereof given to all parties. The jurors whose names appear thereon shall be brought into open court, the case shall be called and in the presence of the district attorney and the defendant and his attorney, the jurors shall be examined on voir dire for the trial of the case at hand. After the conclusion of the voir dire examination and the removal from the strike list of the names of those jurors who were challenged or excused for good reason, the district attorney shall be required first to strike from the strike list the name of one juror, and the defendant shall strike one, and they shall continue to strike off names alternately until only 12 jurors remain on the strike list and these 12 jurors thus selected shall be the jury charged with the trial of the case. If any defendant shall refuse to exercise a strike to which he is entitled, then the judge presiding shall exercise that defendant's strike for him. The number of names appearing on the strike list upon commencement of striking, unless a lesser number is agreed to by the parties, shall not be less than 36 if the offense charged is a capital felony nor less than 24 if the offense charged is a felony not punished capitally nor less than 18 if the offense charged is a misdemeanor or violation. In the event the list of competent prospective jurors is reduced to fewer than the number required by this subsection, the court shall add prospective jurors in the manner prescribed in section 12-16-76. No special venire shall be ordered, drawn, or summoned for the trial of any person indicted for a capital felony. "* * *
"... (Acts 1919, No. 715, p. 1039; Code 1923, § 8641; Code 1940, T. 30, § 60; Acts 1981, No. 81-788, p. 1381, § 5; Acts 1982, No. 82-221, p. 267.)"
An alternate plan is authorized by the provisions of § 12-16-145 and § 12-16-146, and this Court's Advisory Committee on Criminal Procedure has recommended a procedure that substantially follows the procedures set forth in § 12-16-100. See Proposed Revision with Commentary, Alabama Rules of Criminal Procedure, January 1983, Rule 18.4.
Since the adoption by the State of a separate procedure for the selection of jurors in criminal cases, many attacks have been made on the procedure. The one which received the most attention, however, was Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Other challenges have centered around the unequal number of peremptory challenges given the state in some counties, but not in others,[2] and several challenges were made *618 involving individual jury lists, in which claims of racial discrimination were advanced.[3]
In 1978, the Alabama legislature adopted Act No. 594,[4] a comprehensive act which provided for the qualifications and selection of jurors, and which revamped the jury system in Alabama. With the adoption and implementation of this Act, the attacks upon the jury selection process, either by separate lawsuits, or in individual cases, significantly decreased. For a historical account of this Act, see O'Leary v. State, 417 So.2d 219 (Ala.Crim.App.1981), aff'd, 417 So.2d 232 (Ala.1982), cert. den., 463 U.S. 1206, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983).
Sections 1 and 2 of Act No. 594, now codified as Code 1975, § 12-16-55 and § 12-16-56, respectively, read as follows: "§ 12-16-55. Declaration of policy.
"It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity, in accordance with this article, to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose. (Acts 1978, No. 594, p. 712, § 1.)
"* * *
"§ 12-16-56. Discrimination prohibited.
"A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin or economic status. (Acts 1978, No. 594, p. 712, § 2.)"
These two Code sections are significant when a trial court is faced with a Batson or Jackson challenge.
We believe that the Legislature intended, in adopting this public policy, that our trial juries should be selected from a list which contains a fair cross section of the area served by the court, and that any form of discrimination against a particular juror on account of race, color, religion, sex, national origin, or economic status is *619 prohibited, and if liberally interpreted to apply to the State's use of peremptories, the state policy is not inconsistent with Batson or Jackson requirements.
In fact, in Jackson, this Court discussed the principles of Batsonciting both state and federal lawregarding the use of peremptory challenges by the state to exclude from jury service all blacks on the venire. This Court opined:
"The most compelling of the issues raised by Jackson is whether his equal protection rights were violated when the prosecution used its peremptory challenges to strike all ten of the prospective black jurors from the venire. The United States Supreme Court's decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 [90 L.Ed.2d 69] (1986), changed a defendant's burden of proof on the issue of the prosecution's using peremptory challenges to systematically exclude blacks from serving on the jury. The much more stringent burden of Swain v. Alabama, 380 U.S. 202 [85 S.Ct. 824, 13 L.Ed.2d 759] (1965), was in effect at the time of defendant's trial, and the issue before us is whether a rule similar to the rule announced in Batson should be applied to this defendant's trial. We hold that a rule like the rule which the United States Supreme Court announced in Batson v. Kentucky, supra (that `a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial,' 476 U.S. at 96, 106 S.Ct. at 1722-23), is to be applied to Jackson's trial."
In Jackson, this Court noted the criticism that had been leveled against the decision in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and noted that several state courts had found that their state constitutions required a lesser burden on a defendant to prove purposeful discrimination than that required by Swain. The Court cited the cases of State v. Neil, 457 So.2d 481 (Fla.1984); People v. Thompson, 79 A.D.2d 87, 435 N.Y.S.2d 739, (1981); State v. Crespin, 94 N.M. 486, 612 P.2d 716 (Ct.App.1980); Commonwealth v. Soares, 377 Mass. 461, 387 N.E.2d 499, cert. den., 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978). 516 So.2d at 771-772.
This Court, in Ex parte Jackson, specifically stated:
"We particularly note the holding of the Florida Supreme Court in Neil, supra:

"`Article I, section 16 of the Florida Constitution guarantees the right to an impartial jury. The right to peremptory challenges is not of constitutional dimension. The primary purpose of peremptory challenges is to aid and assist in the selection of an impartial jury. It was not intended that such challenges be used solely as a scalpel to excise a distinct racial group from a representative cross-section of society. It was not intended that such challenges be used to encroach upon the constitutional guarantee of an impartial jury. As did the New York, California, and Massachusetts courts, we find that adhering to the Swain test of evaluating the peremptory challenges impedes, rather than furthers, article I, section 16's guarantee. We therefore hold that the test set out in Swain is no longer to be used by this state's courts when confronted with the allegedly discriminatory use of peremptory challenges.'
"457 So.2d at 486.
"Although we know that the United States Supreme Court has not yet ruled on whether Batson v. Kentucky is to be applied retroactively, this Court does not need to await revelation from the federal judiciary when our own state constitution also guarantees to a criminal defendant the equal protection of the laws. Sections 1, 6, and 22, Ala. Const.1901, combine to guarantee equal protection of the laws. City of Hueytown v. Jiffy Chek Co., 342 So.2d 761 (Ala.1977). Analysis of equal protection issues under the United States Constitution is equally applicable to those same issues under the Alabama *620 Constitution. Jefferson County v. Braswell, 407 So.2d 115 (Ala.1981).
"The doctrine of equal protection of the laws requires that the guarantee of trial by an impartial jury not be illusory. The defendant Jackson was under the Swain burden when he attempted to show the prosecution's alleged discriminatory use of its peremptory strikes. This was too great a burden. Our state constitution requires that Jackson be entitled to test the prosecution's use of its peremptory strikes under a rule similar to the one set forth in Batson v. Kentucky...."
This Court then spelled out the procedure which must be followed once a prima facie showing is made by an accused:
"Once the defendant has made a prima facie case of purposeful discrimination, then the prosecution must come forward with valid non-racial reasons for its strikes. The Florida Supreme Court has given an illustration of the prosecution's burden:
"`The reasons given in response to the court's inquiry need not be equivalent to those for a challenge for cause. If the party shows that the challenges were based on the particular case on trial, the parties or witnesses, or characteristics of the challenged persons other than race, then the inquiry should end and jury selection should continue. On the other hand, if the party has actually been challenging prospective jurors solely on the basis of race, then the court should dismiss that jury pool and start voir dire over with a new pool.'
"Neil, 457 So.2d at 487.
"No merely whimsical or fanciful reason will suffice as an adequate explanation. In light of the circumstances of the case, the trial court must use its discretion in determining whether the prosecutor's reasons are adequate." (Emphasis added.)
In Jackson, the prosecutor was not required to come forward with race-neutral reasons. In this case, the trial court did, "[o]ut of perhaps more caution than anything else," require the State to explain why the particular persons were selected for peremptory strikes, so this case is in a different procedural posture. In Jackson, the case was remanded to allow the State to present race-neutral reasons, if it could. The mandate of Jackson was not available to the trial court in this case at the time it found that the State had met its burden; therefore, in the interest of justice, we are of the opinion that the trial judge should be given another opportunity to examine his findings in light of the requirements of Batson and Jackson.[5]
Based upon this record, we could reverse this case, as some state courts have reversed similar cases, and order a new trial,[6] or we could affirm the judgment on the ground that the state's race-neutral reasons were sufficient.[7] We believe, however, that justice requires that we remand the case to give the trial court an opportunity to review again the sufficiency of the *621 state's race-neutral reasons, under the guidelines we set out in this opinion.

THE BATSON AND JACKSON RULES
What exactly do Batson and Jackson hold? Our interpretation of the opinions in Batson and Jackson shows that they, at least, hold as follows:
(1) The Swain rule, which allowed prosecutors to use their peremptory challenges to exclude members of a cognizable racial group from jury service, has been changed.
(2) Peremptory challenges are not entirely eliminated,[8] but prosecutors are restricted in their use, and if prosecutors' use of them is challenged and a prima facie case of discrimination is shown, prosecutors must be able to give neutral reasons for their use.
(3) Peremptory challenges may be, and "unfortunately [have] been used to discriminate against black jurors."[9]Batson, 476 U.S. at 99, 106 S.Ct. at 1724 (emphasis added).
(4) The State's privilege to strike individual jurors through peremptory challenges is subject to the commands of the Fourteenth Amendment, Batson, and Sections 1, 6, and 22 of the Alabama Constitution of 1901. Jackson.
(5) Racial discrimination in the selection of jurors harms not only the accused, whose life and liberty they are summoned to try, but could also discriminate against the excluded juror, thereby undermining "public respect for our criminal justice system," Batson, 106 S.Ct. at 1724, and could violate the public policy of this state that each person called is entitled to be "considered" for service. Code 1975, § 12-16-55.
(6) Both the Alabama and Federal Constitutions prohibit a prosecutor from challenging a potential juror solely on account of his or her race, or on the assumption that black jurors, as a cognizable group, will be unable to impartially consider a case.
(7) It is the duty of the trial court to determine, first, whether the defendant has made a requisite showing of the racially discriminatory use of peremptory challenges, and to further determine whether the "prosecutor [has] articulate[d] a neutral explanation related to the particular case to be tried." (Emphasis added.) Batson, 476 U.S. at 98, 106 S.Ct. at 1723. "No mere whimsical or fanciful reason will suffice." (Emphasis added.) Jackson, 516 So.2d at 772 (Ala.1986).

IMPLEMENTATION OF BATSON AND JACKSON

We now set out some general guidelines for lower courts to follow until this *622 Court, under its rule-making power, can adopt a more specific rule of procedure, or until the Legislature adopts a procedure that would comport with the State and Federal Constitutions.[10] This inquiry should become a part of the trial record so that there will be a sufficient record for appellate review. People v. Wheeler, 22 Cal.3d 258, 280, 583 P.2d 748, 764, 148 Cal.Rptr. 890, 905 (1978); see generally, Jackson, supra.
The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination.[11] In determining whether there is a prima facie case, the court is to consider "all relevant circumstances" which could lead to an inference of discrimination. See Batson, 476 U.S. at 93, 106 S.Ct. at 1721, citing Washington v. Davis, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
1. Evidence that the "jurors in question share[d] only this one characteristictheir membership in the groupand that in all other respects they [were] as heterogeneous as the community as a whole." Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905. For instance "it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions," Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
*623 2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire. Swain, supra.
4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355, (Fla.Dist.Ct.App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 504 So.2d at 352 and 355.
7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. at 242, 96 S.Ct. at 2049.
9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner, supra.
After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. Jackson, supra; Neil, 457 So.2d at 487; Wheeler, 22 Cal.3d at 281-82, 583 P.2d at 765, 148 Cal. Rptr. at 906.
In addition to a clear, specific, and plausible nondiscriminatory explanation of a specific characteristic that affected the decision to challenge, the following are illustrative of the types of evidence that can be used to overcome the presumption of discrimination and show neutrality:
1. The state challenged non-black jurors with the same or similar characteristics as the black jurors who were struck.
2. There is no evidence of a pattern of strikes used to challenge black jurors; e.g., having a total of 6 peremptory challenges, the state used 2 to strike black jurors and 4 to strike white jurors, and there were blacks remaining on the venire.
Batson makes it clear, however, that "[t]he State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties. Rather, the State must demonstrate that `permissible racially neutral selection criteria and procedures have produced the monochromatic result.'" Batson, 476 U.S. at 94, 106 S.Ct. at 1721, citing Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972). Furthermore, intuitive judgment or suspicion by the prosecutor is insufficient to rebut the presumption of discrimination. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. Finally, a prosecutor cannot overcome the presumption "merely by denying any discriminatory motive or `affirming his good faith in individual selections.' " Batson, 476 U.S. at 98, 106 S.Ct. at 1723, citing Alexander, 405 U.S. at 632, 92 S.Ct. at 1226.
*624 Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext. Wheeler, 22 Cal.3d at 282, 583 P.2d at 763-64, 148 Cal.Rptr. at 906. Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:
1. The reasons given are not related to the facts of the case.
2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
3. Disparate treatmentpersons with the same or similar characteristics as the challenged juror were not struck. Slappy, 503 So.2d at 354; Turner, 42 Cal.3d at 725, 726 P.2d at 110, 230 Cal.Rptr. at 664; Wheeler, 22 Cal.3d at 282, 583 P.2d at 760, 148 Cal.Rptr. at 906.
4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the venire. Cf. Slappy, 503 So.2d at 354; Turner, 42 Cal.3d at 715, 726 P.2d at 103, 230 Cal.Rptr. at 657.
6. "[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically." Slappy, 503 So.2d at 355. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror.
The trial court, in exercising the duties imposed upon it, must give effect to the state policy expressed in Sections 1, 6, and 22 of the Alabama Constitution and Code 1975, § 12-16-55 and § 12-16-56. Furthermore, the trial judge must make a sincere and reasonable effort to evaluate the evidence and explanations based on the circumstances as he knows them, his knowledge of trial techniques, and his observation of the manner in which the prosecutor examined the venire and the challenged jurors. People v. Hall, 35 Cal.3d 161, 672 P.2d 854, 858, 197 Cal.Rptr. 71 (1983); see also Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 906.
In evaluating the evidence and explanations presented, the trial judge must determine whether the explanations are sufficient to overcome the presumption of bias. Furthermore, the trial judge must be careful not to confuse a specific reason given by the state's attorney for his challenge, with a "specific bias" of the juror, which may justify the peremptory challenge:
"The latter, a permissible basis for exclusion of a prospective juror, was defined in Wheeler as `a bias relating to the particular case on trial or the parties or witnesses thereto.' Wheeler, 22 Cal.3d at 276, 148 Cal.Rptr., at 902, 583 P.2d at 760. Further, a review of the record demonstrated that the prosecutor had not, in fact, satisfied his burden of showing that he excluded the Spanish surnamed jurors on the grounds of specific bias."
Slappy, 503 So.2d at 354. The trial judge cannot merely accept the specific reasons given by the prosecutor at face value, see Hall, 35 Cal.3d at 168, 672 P.2d at 858-59, 197 Cal.Rptr. at 75; Slappy, 503 So.2d at 356; the judge must consider whether the facially neutral explanations are contrived to avoid admitting acts of group discrimination. See Slappy, supra. This evaluation by the trial judge is necessary because it is possible that an attorney, although not intentionally discriminating, may try to find reasons other than race to challenge a black juror, when race may be his primary factor in deciding to strike the juror. Finally, if the trial judge determines that there was discriminatory use of peremptory challenges, an appropriate remedy may be to dismiss that jury pool and start over with a new pool. Jackson, supra, citing Neil, supra, at 487. This remedy is not exclusive, however.
*625 As suggested, the foregoing are simply illustrations, based on the recent development of case law in this area,[12] of the types of evidence and considerations that can be taken into account in evaluating whether peremptory challenges have been used in a discriminatory manner. Certainly, as the law develops, more may be added.
The trial judge should not, as he did in this case, wait until the end of the trial to make a ruling on the motion for a mistrial based on the state's impermissible use of its peremptory challenges. The trial judge should rule on any motion that attacks the state's use of its peremptory strikes before the jury is sworn to try the case, unless, of course, the parties agree to allow the state to present race-neutral reasons at a later time. We do not suggest that the additional time, as was given in this case, necessarily allowed the prosecutors in this case to present race-neutral reasons they did not have at the time the motion was made, but the allowance of additional time would present this opportunity, if a prosecutor were so inclined. Furthermore, a ruling on the matter before the jury is sworn would result in judicial economy.

SCOPE OF REVIEW ON APPEAL
What is the scope of review on appeal from a finding by the trial judge that the state has given a satisfactory neutral explanation? This, too, is a question of first impression. In Batson, the Court stated that "[w]e have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." Batson, 476 U.S. at 97, 106 S.Ct. at 1723. In Batson, the Court, in footnotes 20 and 21, discussed how it had handled similar cases involving claims of discrimination, and the weight to be given court findings:
"The Court of Appeals for the Second Circuit observed in McCray v. Abrams, 750 F.2d [1113] at 1132 [(2d Cir.1984)], that `[t]here are any number of bases' on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause. As we explained in another context, however, the prosecutor must give a `clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981).
"In a recent Title VII sex discrimination case, we stated that `a finding of intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court. Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. Id., at 573, 105 S.Ct. at 1511."
Batson, 476 U.S. at 98, 106 S.Ct. 1723, 1724.
In Jackson, this Court said that the "trial court must use its discretion" in determining whether the prosecutor's reasons are adequate.
In view of the statements made both in Batson and Jackson, we believe that the Court of Criminal Appeals correctly held that "[w]e may only reverse the trial judge's determination that the prosecution's peremptory challenges were not motivated by intentional discrimination if that determination is clearly erroneous," citing United States v. Mathews, 803 F.2d 325, 330 (7th Cir.1986). The Court of Criminal Appeals, applying this standard of review, concluded:
"We find that the trial court's treatment of Branch's motions and its ruling were proper, for the prosecution's explanations for its strikes were neutral, clear and reasonably specific, legitimate, and related to the outcome of the case. After *626 considering all the relevant circumstances, as the trial court did, we also conclude that Branch failed to carry his ultimate burden of proving discriminatory selection of the petit jury; thus, we cannot say that the court's ruling was `clearly erroneous.'"
After reviewing the same record as did the Court of Criminal Appeals, we do not come to the same conclusion, at this time.[13]

CONCLUSION
The history of this state, insofar as peremptory challenges are concerned, shows that the defendant has been favored throughout most of this history. The legal attacks that have been made upon this state's jury selection process indicate that racial bias may have played a significant role in the past in the jury selection process, but any improper practice of the past should not affect the present application of the law as set forth in Batson and Jackson. As this Court pointed out in Beck v. State, 396 So.2d 645 (Ala.1981), in discussing the application of guidelines in death penalty cases:
"The possibility of racial or other bias in the trial or sentencing process has greatly diminished in Alabama in the last several years. To begin with, the entire judicial system was revamped and Alabama is now recognized nationally as having one of the best judicial systems in the nation. The Death Penalty Act was passed by a legislature which was reapportioned under a federal court order which insured representation of minorities by a wholesale redistricting of the state. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct., 1362, 12 L.Ed.2d 506 (1964). Furthermore, Alabama has adopted a Jury Selection Act which declares, as policy, `that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity, in accordance with this article, to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose.' Code 1975, § 12-16-55. Discrimination in jury selection is specifically prohibited. Code 1975, § 12-16-56."
Article 1 of our State Constitution provides:
"That the great, general, and essential principles of liberty and free government may be recognized and established, we declare:
"§ 1. That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."
*627 This section has been the first "Article" and the first "Section" of every constitution the people of this state have ever ratified. While we recognize that the Constitutions of 1819 and 1861 used the word "freemen" instead of the word "men," we need only accept that as being a part of our history, and that the mandates of the Constitution of 1901 make no distinction among our citizens with regard to the right to "life, liberty, and the pursuit of happiness."
In the Jackson case, this Court cited Section 1 of our state constitution, and, in this opinion, we cite our legislative policy regarding the drawing, selecting, and empanelling of our juries. As judges, we have taken an oath to uphold the principles embodied in our state and federal constitutions.
The jury, which is such an integral part of the judicial system of this state, should be impartial and free of bias and prejudice. On the other hand, no citizen should be denied his right to be "considered" for jury service "on account of race, color, religion, sex, national origin or economic status." § 12-16-55 and § 12-16-56. Public respect for our criminal justice system and the rule of law demands that these public policies be implemented.
We recognize that prosecutors and defense counsel alike are generally faced with selecting a jury for the trial of a case from a strike list that contains the names of many individuals on whom they have limited knowledge, or no knowledge, of their backgrounds, biases, prejudices, or qualifications to serve on a particular case. In the past, it is probable that prosecutors did engage in general "stereotyping" in order to eliminate those individuals who they thought might harbor some undisclosed bias or prejudice. Batson and Jackson definitely affect the manner of the exercise of those types of peremptory challenges, but they do not eliminate peremptory challenges. Obviously, Batson and Jackson place more responsibility on trial judges, and on prosecutors, but as the Supreme Court of the United States noted in Batson, the proper use of voir dire can, in many instances, ferret out any hidden bias or prejudice on the part of a particular juror, and while that hidden bias or prejudice in a particular case might not rise to the point of being a challenge for cause, it could form the basis for a valid peremptory challenge. We are confident that our judicial system is capable of using the guidelines we establish herein to guarantee the right of every accused a fair trial, and to preserve "public respect for our criminal justice system and the rule of law." Batson, 476 U.S. at 99, 106 S.Ct. at 1724.
We realize that the trial court and the Court of Criminal Appeals were reviewing the requirements of Batson with little guidance on how a trial judge should discharge his responsibility when a defendant raises a Batson objection. We have the benefit of several cases decided in other jurisdictions, which may or may not have been called to the attention of those courts. We also have benefited from some reviews of Batson that have been made in legal publications. We believe that the guidelines that we set out in this opinion will not only aid the trial court in this case, but other courts faced with a Batson or Jackson challenge.
After reviewing this cause, we cannot conclude that the trial judge's findings should be affirmed; neither can we conclude, at this time, that we should reverse; therefore, we remand the case to the Court of Criminal Appeals with directions to remand it to the trial court for the purpose of allowing the trial judge to review again the proceedings conducted before him, using the guidelines we adopt in this opinion. In carrying out this responsibility, he may or may not conduct an additional hearing at which either party would be allowed to introduce evidence to show the bona fides, or lack thereof, of the state's peremptory challenges. The defendant, although not required to do so, may want to show, if he can, a "pattern" of the use by the state of peremptory challenges in cases.[14]
*628 Based on the foregoing, the cause is remanded[15] to the Court of Criminal Appeals for further proceedings consistent with this opinion, and with directions to the Court of Criminal Appeals to remand the cause to the trial court to conduct proceedings consistent with this opinion, and with directions to the trial court to file with the Court of Criminal Appeals its findings and conclusions, not more than 56 days after entry of that court's mandate. After receipt of the trial court's order and judgment after remand, the Court of Criminal Appeals is directed to review the trial court's order as it would on an original appeal. If aggrieved by the order of the Court of Criminal Appeals after remand, either party may then request this Court to review that order as permitted by Rule 39, Ala.R.App.P.
We cannot hope to answer all the questions that will be raised by the Batson and Jackson cases. Why was Batson decided as it was? In a comment in the Akron Law Review, there is one interpretation:
"Undoubtedly, the heart of Swain was the recognition that the peremptory is the most effective method of identifying and excluding those jurors most strongly biased in favor of the oppositionsomething the challenge for cause does not allow. Reliance on the peremptory is at a premium in criminal trials because attorneys have `less than perfect information about the predispositions and hidden biases of prospective jurors.' In such trials monetary considerations preclude use of innovative juror information techniques. Attorneys are forced to `rely on stereotypes, common sense judgments and even common prejudices in deciding whether a juror with a given age, race, sex, religion, ethnic background, and occupation will act impartially toward a particular defendant.' The peremptory has allowed litigants to rely on these considerations and exclude petit jurors accordingly. Not requiring a reason for peremptorily challenging a juror `avoids trafficking in the core of truth in most common stereotypes,' and essentially `allows the covert expression of what we dare not say but know is true more often than not.' The Supreme Court's refusal in Swain to impose judicial scrutiny on the peremptory facilitated its salutary effects.
"Why, then, did the Batson Court find that the peremptory challenge is a jury selection practice that `has been used to discriminate against black jurors?' A number of factors can be attributed to justify the Batson holding.
"One is simply history. Justice Powell placed much emphasis on the antidiscrimination principles emanating from the `venire cases,' in which the Court consistently struck down state attempts to systematically exclude blacks from the jury venire. Such discrimination was held to violate the defendant's right to an impartial jury whether by force of statutes that purposefully excluded members of the black race, or through facially neutral statutes that were discriminatory in application. These cases stood for the proposition that racial discrimination in the selection of jurors harms the accused. The majority followed Strauder *629 v. West Virginia [100 U.S. (10 Otto) 303, 25 L.Ed. 664], which is characterized as `the most vigorous statement of the antidiscrimination principle to be found in the United States for a full century after emancipation.' Such a description is warranted by the broad and sweeping language of Strauder: "`The right to a trial by jury is guaranteed.... The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected ... to determine ... and is the grand bulwark of his liberties.... In view of these considerations ... how can it be maintained that compelling a colored man to submit to a trial for his life by a jury drawn from a panel from which the state has expressly excluded every man of his race, because of color alone, however well qualified in other respects, is not a denial of equal legal protection?'
"Swain effectively thwarted Strauder's broad commitment to non-discriminatory jury selection by insulating the peremptory from attack when used at the petit jury level." (Footnotes omitted.)
Wilson, Batson v. Kentucky: Can the `New' Peremptory Challenge Survive the Resurrection of Strauder v. West Virginia? 20 Akron L.Rev. 355 (1986).
Can the "new" peremptory challenge survive the resurrection of Strauder? Of course, the Supreme Court of the United States and this Court are of the opinion that the peremptory challenge can survive, but its use will be closely scrutinized in some cases. It is because we want the trial court to further scrutinize its own findings in this case, in view of the guidelines that we set out, that we remand it. Trial judges, under Batson, have great responsibility to ensure that there be a non-discriminatory selection of a jury.[16] The *630 *631 Batson court expressed confidence that the trial bench would ensure the constitutional rights guaranteed by its holding. We remand the case with the same confidence.
REMANDED, WITH DIRECTIONS.
JONES, ALMON, SHORES, ADAMS and STEAGALL, JJ., concur.
TORBERT, C.J., concurs specially.
BEATTY and HOUSTON, JJ., dissent.
TORBERT, Chief Justice (concurring specially).
This case presents this Court with the situation that all members of the bench and bar could anticipate when Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986), and Ex parte Jackson, 516 So.2d 768 (Ala.1986), were decided. Specifically, the problem is that there is an inherent tension between the concept of peremptory challenges, which allows the parties to strike prospective jurors without cause, and the Batson rule that prospective jurors can not be struck on account of race. How do we in practice enforce the rule of Batson while retaining the use of peremptory challenges?
Perhaps it will be necessary, as Justice Beatty suggests, to abandon the use of peremptory challenges if it turns out that as a practical matter the costs of dealing with that tension outweigh the benefits of peremptory strikes. Those costs are the loss of precious judicial time and diversion of the judicial system from the resolution of cases. Clearly, if we are to err, we must err on the side of eliminating the racially discriminatory use of strikes.
While the majority opinion attempts to set forth some broad guidelines to be employed in dealing with Batson issues, it is obvious that we must rely on the trial judge to supervise the jury selection process. Because of the difficulty of reviewing on appeal, from a cold record, the subjective reasons that a juror was struck, we must accord much deference to the trial judge's determination.
In this case, the trial court determined that the prosecution did not use its strikes in a racially discriminatory manner. Much of the majority opinion deals with evaluating the prosecutor's stated reasons for striking certain jurors in light of the questions posed to those jurors in particular and to all prospective jurors in general. However, in this case, there is little in the record to indicate how the voir dire was conducted. Therefore, I see little benefit in remanding this cause for reconsideration. While the trial judge may have some memory of the jury selection process, I believe it doubtful that he can in fact remember the kind of specifics necessary to conduct the evaluation contemplated by the majority opinion.
I must point out that if the voir dire examination in this case in fact supports the reasons advanced by the prosecutor for striking the jurors in question, I would agree with Justice Houston that the trial court's decision is due to be affirmed. However, in light of the fact that the trial court was operating in uncharted waters and because there is some possibility that upon reflection, guided by the criteria set forth in this Court's opinion, he might reach another conclusion, I reluctantly agree to remand this case.
BEATTY, Justice (dissenting).
I concur in Justice Houston's dissent. Since the United States Supreme Court has effectively decided that certain "peremptory" strikes may not, in fact, be "peremptory," I agree that the better forum for the determination whether those peremptory strikes were indeed proper (i.e., race neutral) is the trial court, whose decisions thereon should not be overturned absent a showing that they are clearly erroneous. I fear that, otherwise, these cases will become, *632 upon review, exercises in second-guessing the unbiased sincerity of the district attorneys throughout the state. If, indeed, that occurs, perhaps the better solution would be to do away altogether with peremptory strikes.
HOUSTON, Justice (dissenting).
I dissent. The majority holds that it "cannot conclude that the trial judge's findings should be affirmed." I feel that the majority opinion made a quantum leap from its excellent discussion of our jury system, Batson, Jackson, and peremptory challenges in general to its conclusion in this case. Under the standard of review adopted by the majority opinion in this case and by the United States Court of Appeals for the Seventh Circuit in United States v. Mathews, 803 F.2d 325 (7th Cir.1986), cert. granted, ___ U.S.___, 107 S.Ct. 1601, 94 L.Ed.2d 788 (1987),[1] I must dissent.
Our standard of review is that unless the trial court's determination is clearly erroneous we will not reverse the trial court's finding that (1) the defendant did not make a prima facie case of purposeful discrimination or (2) (if the trial court found that the defendant did make a prima facie case of discrimination) that the state's peremptory challenges were not motivated by racial discrimination. Since our standard of review is the "clearly erroneous" standard, I would not remand, for I am not persuaded that the trial court was clearly wrong in finding that the state's peremptory challenges were not motivated by racial discrimination.
I am assuming that the trial court did find that the defendant made a prima facie case. Under the evidence, we could not hold that such a finding was clearly erroneous. The trial court stated: "Out of perhaps more caution than anything else, I am going to require the state lawyers to explain why you selected those persons for peremptory strikes."
Since this case is being remanded to the Court of Criminal Appeals for its remand to the trial court, I would request that the trial court first address the issue of whether the defendant presented a prima facie case.
To establish a prima facie case of purposeful discrimination in the selection of the petit jury solely on evidence concerning the state's exercise of peremptory challenges at Branch's trial, Branch must show that:
1. He is a member of a cognizable racial group. The record shows that Branch is black. This element is established.
2. The state has exercised peremptory challenges to remove from the venire members of the defendant's race. The record shows that the state peremptorily struck some blacks. This element is established.
3. Peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. The trial court should take judicial notice of this, for Justice Powell, in the opinion of the Court in Batson, wrote: "[T]he defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' "Batson, 476 U.S., at 79, 106 S.Ct., at 1723 (quoting Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953)) (emphasis supplied). This element is established.
4. Items (1) through (3) and any other relevant circumstances raise an inference that the state used the practice to exclude the veniremen from the petit jury on account of their race. "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established" by the evidence in the case. Black's Law Dictionary 700 (5th ed. 1979). In this case the state used six of its seven peremptory challenges to remove blacks. One black served on the jury. Why was one black left on the jury? Does this alone *633 keep us from logically and reasonably concluding that the other six strikes were not racially motivated? (In Batson the defendant was black and he was tried by an all-white jury.) The record contains none of the voir dire of the white juror who was struck. The able attorney for Branch states compelling reasons for the state's having to strike this juror. If the state peremptorily challenged all blacks or used all of its peremptory challenges to remove blacks, and the case involved a black defendant and a victim of another race, we could logically and reasonably conclude that this was racially motivated; and, if the trial court held that the defendant had not established a prima facie case, this would be clearly erroneous. In this case the defendant was black, the victim was black, and the "eye witness" whose testimony was the foundation stone of the state's case was black; and the state did not peremptorily challenge all blacks or use all of its peremptory challenges to remove blacks. This is where the trial court must use its discretion in determining, after considering all relevant circumstances, whether the state's use of peremptory challenges created a "prima facie case of discrimination against black jurors." Batson, 476 U.S., at 97, 106 S.Ct., at 1723. The trial court's decision must not be reversed unless it is clearly erroneous. See United States v. Mathews, 803 F.2d, at 329-32.
If the trial court finds that the defendant made a prima facie case of racial discrimination, then the burden shifts to the state to rebut the prima facie case. It cannot rebut it by saying nothing. The state cannot rebut it "merely by denying that [it] had a discriminatory motive or `affirming [its] good faith in individual selections.'" Batson, 476 U.S., at 79, 106 S.Ct., at 1723 (quoting Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)). Nor may the state "rebut the defendant's prima facie case of discrimination by stating merely that [it] challenged jurors of the defendant's race on the assumptionor [its] intuitive judgmentthat they would be partial to the defendant because of their shared race." Batson, 476 U.S., at 97, 106 S.Ct., at 1723. These are the only explanations that Batson said would not rebut this prima facie case. The state must articulate a racially neutral explanation related to the particular case to be tried to rebut this prima facie case, once the trial court finds that the prima facie case has been established. Batson, 476 U.S., at 97, 106 S.Ct., at 1723.
After painstaking review of the explanations articulated by the state for its strikes, I cannot say that the trial court's finding that the state rebutted the defendant's prima facie case was "clearly erroneous." See United States v. Mathews, 803 F.2d, at 329-32.
The first strike (Harris): One of the prosecutors made a "bust" five months before the trial at a home close to Harris's residence and saw Harris during the bust. He thought that Harris had some relationship to the person arrested. Harris was similar in age and physical appearance to Branch. What makes the trial court's finding that this was a racially neutral explanation clearly erroneous?
The second strike (Maynor): This juror worked at Gold Kist with a number of people who were being investigated for a variety of crimes. The prosecutors' past experience with employees of Gold Kist (white and black) was that they were not attentive as jurors. What makes the trial court's finding that this was a racially neutral explanation clearly erroneous?
Third strike (Meadows) and sixth strike (Kelley): Meadows was unemployed and appeared to have a dumbfounded or bewildered look on her face as if she did not know what she was supposed to do. Kelley was frowning and her response to defense counsel was much more favorable than her response to the prosecutors.
We communicate by body language, and in many other nonverbal ways. Facial expressions and the way people sit, stand, cross their legs, cross their arms, and so on, represent the way they think and feel at any given moment. I believe that things that are communicated nonverbally, other than a person's race, can be used by prosecutors in determining how they will use *634 peremptory challenges. Such information can be as valuable as, if not more valuable than, verbal information elicited by voir dire.
The trial judge conducts or is present during voir dire and is in a position to know if the prosecutor is fabricating when he assigns as a reason for his strike negative nonverbal responses. What makes the trial court's finding that the third and sixth strikes were based on racially neutral explanations clearly erroneous?
Fourth strike (Nelson): Nelson was a scientist. The prosecution stated that it did not want someone who had a tendency to measure with one hundred percent mathematical certainty as a juror, for it would place too great a burden on the state. What makes the trial court's finding that this was a racially neutral explanation clearly erroneous?
Fifth strike (Parmer): Parmer's general appearance was unkempt. He appeared to be gruff. He worked in credit management. The prosecutors did not want a juror who would be at odds with anyone else on the jury. What makes the trial court's finding that this was a racially neutral explanation clearly erroneous?
I do not understand what we expect from the trial court on remand. Certainly, nothing new can be presented by the state. The trial took place over 16 months ago. What the trial court did either was clearly erroneous or was not. I say that it was not, and I would affirm.
BEATTY, J., concurs.

ON APPLICATION FOR REHEARING
PER CURIAM.
The opinion has been modified slightly to meet some objections raised by the State and the Alabama District Attorneys Association, as amicus curiae, but otherwise remains unchanged.
OPINION MODIFIED; APPLICATION OVERRULED.
MADDOX, JONES, ALMON, SHORES, ADAMS and STEAGALL, JJ., concur.
TORBERT, C.J., concurs specially.
BEATTY and HOUSTON, JJ., dissent.
NOTES
[1] In Batson, the Supreme Court, in a footnote, stated:

"In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today. For the same reason, we express no view on whether it is more appropriate in a particular case, upon a finding of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case, see Booker v. Jabe, 775 F.2d [762] at 773 [(6th Cir.1985)], or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire, see United States v. Robinson, 421 F.Supp. 467, 474 (Conn.1976), mandamus granted sub nom. United States v. Newman, 549 F.2d 240 (CA2 1977)."
476 U.S. 79, 99-100, 106 S.Ct. 1712, 1724, 90 L.Ed.2d 69 (1986).
[2] The first references to peremptory jury challenges which we have found appear in Toulmin's Digest of the Laws of the State of Alabama, 1823. According to that Digest, four jurors could be peremptorily challenged by each side in civil cases. In criminal cases, the state was allowed no peremptory challenges. Toulmin Code 1823, Tit. 17, Chap. IX, § 1. In capital cases, the defendant was allowed up to 20 peremptory challenges. Code 1823, tit. 17, chap. I, § 14.

In succeeding codifications of Alabama law, peremptory challenges continued to be given only to defendants, and in specific numbers, depending on the crime charged. (See, e.g., Code 1876, § 4879, providing that a defendant on trial for a noncapital felony was allowed 15 peremptory challenges.)
A major change came in 1919, when the Legislature, 1919 Ala.Acts 715, gave the State one strike for every two allowed the defense; this Act was codified in the 1923 Code as § 8641, and it continued to provide that the State had one strike for the defendant's two; this two-for-one strike advantage was carried forward in the 1940 Code as Title 30, § 60; a different procedure was provided for in Jefferson County; Title 62, § 221, provided that the parties would be furnished a list of twenty-four competent jurors, "from which a jury must be obtained by the prosecution striking first ... one juror, and then the defendant striking ... one juror" (emphasis added). Equal protection challenges by those convicted under the one-to-one system were not successful. Dixon v. State, 27 Ala.App. 64, 167 So. 340 (1936); Junior v. State, 47 Ala.App. 518, 257 So.2d 844 (1971), cert. den., 288 Ala. 744, 257 So.2d 852 (1972), cert. den., 407 U.S. 923, 92 S.Ct. 2473, 32 L.Ed.2d 810 (1972).
This two for one defendant's advantage was carried forward by the Recompiled 1958 Code, Tit. 30, § 60, and in the 1975 Code as § 12-16-100, and was changed by the Legislature by Act 82-221 (effective April 15, 1982), 1982 Ala.Acts 221. This Act is currently reflected in Code 1975, § 12-16-100, which provides for jury striking procedures on a one-to-one basis in criminal cases statewide.
[3] At least twenty-four Alabama counties have had legal actions commenced against them due to alleged discriminatory jury selection procedures: Hadnott v. Narramore (Autauga), 2681-N (M.D.Ala.1969); Dennard v. Baker (Barbour), 2654-N (M.D.Ala.1968); Huff v. White (Bibb), 68-223 (N.D.Ala.1973); McNab v. Griswold (Bullock), 2653-N (M.D.Ala.1968); Palmer v. Steindorff (Butler), 2679-N (M.D.Ala.1968); Bush v. Woolf (Calhoun), 68-206 (N.D.Ala. 1968); Cleveland v. Counselman (Clarke), 5435-69-H (S.D.Ala.1972); Good v. Slaughter (Crenshaw), 2677-N (M.D.Ala.1968); Palmer v. Davis (Dale), 967-S (M.D.Ala.1969); Reese v. Pickering (Dallas), 3839-65 (S.D.Ala.1968); Bokulich v. Jury Commission of Greene County (Greene), 66-562 (N.D.Ala.1968); Black v. Curb (Hale), 3872-65 (S.D.Ala.1966); Croddock v. Bedsole (Henry), 940-S (M.D.Ala.1968); White v. Crook (Lowndes), 2263-N (M.D.Ala.1966); State ex rel. Gregg v. Maples (Madison), 286 Ala. 274, 239 So.2d 198 (1970); Black v. Curb (Marengo), 422 F.2d 656 (5th Cir.1970); Penn v. Eubanks (Montgomery), 360 F.Supp. 699 (M.D.Ala.1973); Black v. Coxwell (Monroe), 5025-68-P (S.D.Ala.1969); Turner v. Spencer (Perry), 3871-65 (S.D.Ala. 1966); Webb v. Baxley (Pike), 3564-N (M.D.Ala. 1972); Sumbry v. Williams (Russell), 763-E (M.D.Ala.1968); Nobles v. Waid (St. Clair), 68-618-M (N.D.Ala.1969); Porter v. Freeman (Talladega), 74-G-781-E (N.D.Ala.1981); McNeir v. Agee (Wilcox), 3945-65 (S.D.Ala.1966).
[4] Act No. 594, Acts of Alabama, 1978, p. 712; also, see, Act No. 14, Acts of Alabama, 1978, 2d Ex.Sess., p. 1692.
[5] The record shows that Batson had just been decided when this case was tried. Of course, Jackson had not been decided.
[6] See, People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Trevino, 39 Cal.3d 667, 704 P.2d 719, 217 Cal.Rptr. 652 (1985); People v. Motton, 39 Cal.3d 596, 704 P.2d 176, 217 Cal.Rptr. 416 (1985); People v. Hall, 35 Cal.3d 161, 672 P.2d 854, 197 Cal.Rptr. 71 (1983); People v. Allen, 23 Cal.3d 286, 590 P.2d 30, 152 Cal.Rptr. 454 (1979); Holley v. J & S Sweeping Co., 143 Cal.App.3d 588, 192 Cal.Rptr. 74 (1983); Commonwealth v. Reid, 384 Mass. 247, 424 N.E.2d 495 (1981); Commonwealth v. Walker, 379 Mass. 297, 397 N.E.2d 1105 (1979); Commonwealth v. DiMatteo, 12 Mass.App.Ct. 547, 427 N.E.2d 754 (1981); Commonwealth v. Brown, 11 Mass.App.Ct. 288, 416 N.E.2d 218 (1981); State v. Neil, 457 So.2d 481 (Fla.1984); City of Miami v. Cornett, 463 So.2d 399 (Fla.Dist. Ct.App.1985), dismissed, City of Miami v. Cornett, 469 So.2d 748 (Fla.1985); Jones v. State, 464 So.2d 547 (Fla.1985).
[7] See, People v. Dominick, 182 Cal.App.3d 1174, 227 Cal.Rptr. 849 (1986); People v. Clay, 153 Cal.App.3d 433, 200 Cal.Rptr. 269 (1984); Commonwealth v. Lattimore, 396 Mass. 446, 486 N.E.2d 723 (1985); Commonwealth v. Smith, 12 Mass.App.Ct. 667, 428 N.E.2d 348 (1981); Baynard v. State, 518 A.2d 682 (Del.1986); Finklea v. State, 471 So.2d 608 (Fla.Dist.Ct.App.1985).
[8] While Justice Marshall thought that the goal of eliminating racial prejudice in the jury selection process could be accomplished only by "eliminating peremptory challenges entirely," (476 U.S. at 103, 106 S.Ct. at 1726), his view was not shared by the Court. In a footnote, the Court noted:

"While we respect the views expressed in Justice Marshall's concurring opinion, concerning prosecutorial and judicial enforcement of our holding today, we do not share them. The standard we adopt under the federal Constitution is designed to ensure that a state does not use peremptory challenges to strike any black juror because of his race. We have no reason to believe that prosecutors will not fulfill their duty to exercise their challenges only for legitimate purposes. Certainly, this Court may assume that trial judges, in supervising voir dire in light of our decision today, will be alert to identify a prima facie case of purposeful discrimination. Nor do we think that this historic trial practice, which long has served the selection of an impartial jury, should be abolished because of an apprehension that prosecutors and trial judges will not perform conscientiously their respective duties under the Constitution."
Batson, 106 S.Ct. at 1724, fn. 22.
[9] The Court's use in Batson of the words "black jurors" instead of "black defendants" was apparently a deliberate choice, because the thrust of the Batson opinion seems designed not only to protect the right of an accused to a fair trial, but also of a black juror's right not to be excluded from jury service, solely because of his race, a requirement not inconsistent with the public policy of this state expressed in Code 1975, § 12-16-55. In Batson, the Court stated that "[i]n view of the heterogeneous population of our nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race." 476 U.S. at 99, 106 S.Ct. at 1724.
[10] One procedural tool trial judges could use to prevent a Batson problem would be to use currently available jury selection statutes. For example, trial judges could limit the number of peremptory strikes available to the parties by not furnishing to the parties a strike list containing a number of names greatly in excess of the minimum number required by Code 1975, § 12-16-100, which provides, inter alia:

"The number of names appearing on the strike list upon commencement of striking, unless a lesser number is agreed to by the parties, shall not be less than 36 if the offense charged is a capital felony nor less than 24 if the offense charged is a felony not punished capitally nor less than 18 if the offense charged is a misdemeanor or violation. In the event the list of competent prospective jurors is reduced to fewer than the number required by this subsection, the court shall add prospective jurors in the manner prescribed in section 12-16-76."
Code 1975, § 12-16-76, states, in part: "`If, prior to commencement of striking, due to challenges for cause or for any other reason, the number of names on the lists from which the parties are to strike is reduced below the minimums established in section 12-16-100 in criminal cases or section 12-16-140 in civil cases, unless the parties agree to strike from such lesser number, the court shall fill the deficiency first from the remaining available petit jurors sworn for the week. If the number of available petit jurors sworn for the week is insufficient to fill the deficiency, the remaining deficiency shall in the discretion of the court be filled by waiting until other petit jurors sworn for the week become available or by randomly drawing or causing to be drawn from the trial court jury box at least twice the number of names needed to fill the deficiency remaining. The court shall forthwith cause to be summoned all prospective jurors thus drawn in any of the manners set forth in this section. The names of those persons found competent to hear the case shall be added to the strike list in at least the number necessary to fill the deficiency. (Acts 1909, No. 227, p. 305; Code 1923, § 8627; Code 1940, T. 30, § 41; Acts 1981, No. 81-788, p. 1381, § 4.)"
We are aware that many prosecutors and defense counsel prefer to strike from as long a list as possible, but courts should be aware that a Batson problem could develop in direct proportion to the number of peremptory strikes available.
[11] In Batson, the Court said:

"To establish such a case, the defendant first must show that he is a member of a cognizable racial group, Castaneda v. Partida, supra, 430 U.S., at 494, 97 S.Ct., at 1280, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Avery v. Georgia, supra, 345 U.S., at 562, 73 S.Ct. at 892. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination."
[12] In footnotes 6 and 7, supra, we have collected the cases our research has indicated which show the "neutral explanations" which have been upheld or found to be insufficient.
[13] Our independent review of the neutral explanations given, and of other facts before the trial court, and facts apparent on the record, gives us great concern. For example, the prosecution's first strike was based on the fact that the prosecutor thought the juror might have seen him at a drug "bust," but the prosecutor did not, insofar as this record shows, question the juror about this fact. Strikes based on "age," while sometimes relevant, are basically "group-based" strikes. The second strike was based on the prosecutor's belief that Gold Kist employees did not make good jurors. This, too, is in the nature of a "group-based" strike, and there is no examination of this juror apparent in the record to determine any further information about the juror and the juror's competency to serve. The third strike was based on the fact that the prosecutor did not like students, especially those who couldn't get jobs. There is no voir dire which indicates how that fact had any bearing on this particular case. The prosecution's fourth strike was of a black juror on the ground that he was a scientist, yet the prosecution did not strike two whites with similar jobs. The prosecution's fifth strike was based on the fact that the juror worked in credit management. This, too, partakes of a possible "group-based" strike, as does the sixth, which was based on the "age" of the juror. We recognize that in many cases, both criminal and civil, lawyers frequently engage in "stereotyping" when exercising their peremptory strikes. Batson and Jackson severely limit "stereotyping" in particular criminal cases. In this case, which involved a black defendant and a black victim, any racial bias on the part of any prospective juror could be grounds for a challenge for cause, or a sufficient explanation for the exercise of a peremptory, if the record supports the inference that the juror could not try the case impartially. This record is sparse on any attempt to ascertain the struck juror's individual bias in this particular case.
[14] At one point in the exchange, defense counsel stated: "Judge, [i]f you believe that junk and ... [i]f you are going to [accept] that, then that just gives the government prosecutors, who have been living a lie so long that they have never done anything wrong as far as discriminating against blacks, a license to come in and give you some junk like they just gave you." (Emphasis added.)
[15] In remanding the cause, we express no opinion whether the rule in Batson should apply to defense counsel as well as prosecutors. The Batson court "express[ed] no views on whether the Constitution imposes any limit on the exercise of peremptory challenges by defense counsel." Batson, 476 U.S. 89, 106 S.Ct. at 1718 n. 12. See discussion of this question in Kirk, Sixth and Fourteenth Amendmentsthe Swain So of the Racially Discriminatory Use of Peremptory Challenges, 77 Journal of Criminal Law & Criminology 831 (1986). Neither do we express any opinion on the proposition that the only way to eliminate group prejudice is to eliminate peremptory challenges altogether. See Harvey, Batson v. Kentucky: Jury Discrimination and the Peremptory Challenge for Cause, 20 Creighton L.Rev. 221 (1986-1987). One commentator is of the opinion that "[a]rguably Batson's force, if any, will lie in the deterrent effect it will have upon prosecutors," and that "Batson has arguably laid the necessary foundation for banning the peremptory altogether." Wilson, Batson v. Kentucky: Can the `New' Peremptory Challenge Survive the Resurrection of Strauder v. West Virginia?, 20 Akron L.Rev. 355 (1986).
[16] We realize that the responsibility placed on the trial judge is a heavy one and will sometimes require the trial judge to have to steer a course between Scylla and Charybdis, especially when the prosecutor's race-neutral reasons are based upon such intangibles as "body language" and "looks." We are sensitive to the problem faced by the trial judge in this case. A recent case of People v. Charron, 193 Cal.App.3d 981, 238 Cal.Rptr. 660 (Cal.Dist.Ct.App.1987), discusses the problem which the trial judge faced specifically, as follows:

"The answers given by Veizaga and Diego [on voir dire] suggested a limited degree of sophistication and educational background. It was not without some basis that the prosecutor expressed her concern that these two individuals might have difficulty understanding a relatively complex securities-related fraud scheme. Significantly, the prospective jurors not challenged by the prosecution generally exhibited greater business sophistication. These persons included two bookkeepers, a former legal secretary, a receptionist at a savings and loan, and the owner of several small businesses who followed the stock market on a regular basis. Relying as we must on the trial court's first-hand observations of the conduct of counsel (see Hurtado v. Statewide Home Loan Co. (1985) 167 Cal.App.3d 1019, 1025, 213 Cal.Rptr. 712), the court here properly found the prosecutor's statement of reasons with respect to prospective jurors Veizaga and Diego sufficient. "* * *
"The exclusion of prospective juror Dixon raises a different and more difficult question in light of the California Supreme Court's recent decision in People v. Trevino, supra, 39 Cal.3d 667, 217 Cal.Rptr. 652, 704 P.2d 719.
Trevino involved a situation in which the prosecutor used six peremptory challenges to excuse every Hispanic from the jury panel, and thus presents a case which is at least different in degree from the present one. After determining that the class of "Spanish-surnamed" persons constituted a cognizable class for Wheeler purposes (39 Cal.3d at p. 687, 217 Cal.Rptr. 652, 704 P.2d 719), the court went on to consider the prosecutor's proffered justifications for excluding the six individuals and found them wanting in at least four instances (id. at pp. 691-692, 217 Cal.Rptr. 652, 704 P.2d 719). The court's principal concern appears to have been with the exclusion of three female jurors, which the prosecutor attempted to justify based on their sex, age, the age of their children and their equivocal views on the death penalty. The court found the expressed reasons disingenuous in view of the prosecutor's failure to challenge similarly situated non-Hispanic jurors.
"Trevino goes on to condemn the challenge of a fourth Hispanic juror, Robert Guerrero. The prosecutor sought to justify Guerrero's challenge on the basis of uncomfortable body language and the prosecutor's feeling that Guerrero was holding back something in his answers to certain questions. (39 Cal.3d at p. 690, fn. 22, 217 Cal.Rptr. 652, 704 P.2d 719.) The Supreme Court responded: `[T]he district attorney's reason for excluding Robert Guerrero based on his body language and mode of answering certain questions, is particularly untenable in light of Wheeler's requirement of a showing of specific bias.' (Id. at p. 692, 217 Cal.Rptr. 652, 704 P.2d 719.) Footnote 25 adds the following comment: To suggest, as does the dissent, that either body language (post, p. 703, 217 Cal.Rptr. 652, 704 P.2d 719) or a conclusory notion a juror might not form his own opinion (post, p. 703, 217 Cal.Rptr. 652, 704 P.2d 719) rises to the level of specific bias in the Wheeler context, is to reduce the constitutional guarantee to meaningless superficialities.'
"We appreciate the Trevino court's concern that a prosecutor's nonspecific reference to "body language' or `looks' of a prospective juror could become the standard untestable post-hoc justification for what is in reality an unconstitutional exclusion based on group discrimination. Nonetheless, Trevino must be read in light of Wheeler on which it is explicitly based and which it did not remotely purport to overrule:
"`To say that peremptories will ordinarily be exercised only in cases of bias, however, does not clarify the kinds of bias upon which the challenge may permissibly be based. In contrast to the limited list of events authorizing a challenge for cause on the ground of implied bias (Pen.Code, § 1074), the law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative.
"`For example, a prosecutor may fear bias on the part of one juror because he has a record of prior arrests or has complained of police harassment, and on the part of another simply because his clothes or hair length suggest an unconventional lifestyle.... Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust for a juror's objectivity on no more than the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another" (4 Blackstone, Commentaries # 353)upon entering the box the juror may have smiled at the defendant, for instance, or glared at him. Responsive to this reality, the law allows the removal of a biased juror by a challenge for which no reason "need be given," i.e., publicly stated: in many instances the party either cannot establish his reason by normal methods of proof or cannot do so without causing embarrassment to the challenged venireman and resentment among the remaining jurors.' (Wheeler, supra, 22 Cal.3d at p. 275, 148 Cal.Rptr. 890, 583 P.2d 748, fn. omitted; accord People v. Turner (1984) 37 Cal.3d 302, 314-315, 208 Cal.Rptr. 196, 690 P.2d 669.)
"Attempting to reconcile Wheeler and Trevino, it must be conceded that prosecutors purporting to rely solely on their interpretation of body language, gestures and glances do so at their peril Trevino indicates that such justifications will be closely scrutinized by both trial and appellate courts. Here, we recognize that the prosecutor may well have provided as much of a detailed statement of reasons as she could under the circumstances; the "bare looks and gestures" which give rise to legitimate questions of juror bias are not often easy to describe. But focussing solely on the prosecutor's statement of justification for excusing prospective juror Dixon, we admit it comes perilously close to violating Trevino's mandate. (See People v. Moss (1986) 188 Cal. App.3d 268, 279, 233 Cal.Rptr. 153.) Fortunately, there is a significant additional fact here supporting the genuineness of the prosecutor's observations which serves to distinguish this case from Trevino. In her statement of reasons for excusing Dixon, the prosecutor indicated she was initially comfortable with him. It was only into the second day of voir dire that she became concerned about Dixon's facial expressions during a series of questions by defense counsel. This statement is supported by the fact that when she was called upon to assert her fifth peremptory challenge during the first day of questioning, the prosecutor indicated her satisfaction with the jury as constituted. That jury included Dixon. After another challenge had been made by defense counsel, the prosecutor exercised her fifth peremptory against a new prospective juror who had just been seated. It was well into the continued voir dire on the second day that the prosecutor exercised her sixth challenge against Dixon. This sequence of events strongly corroborates the prosecutor's verbal explanations, making us far less inclined than was the court in Trevino to suspect that the challenge was exercised `for reasons other than those presented to the court.' (39 Cal.3d at p. 692, 217 Cal.Rptr. 652, 704 P.2d 719.)
"Moreover, this is not a case in which the trial court misunderstood its obligation to inquire into the prosecutor's reasoning or `abdicated' its responsibility to conscientiously evaluate proffered justifications. (Compare People v. Hall (1983) 35 Cal.3d 161, 168-169, 197 Cal.Rptr. 71, 672 P.2d 854.) Instead, we see a sensitive and experienced judge ruling that a prima facie showing has been made, requiring the prosecutor to explain her reasons, and concluding based on first-hand observations that those reasons were justified. Considering all these factors, we think it was proper for the trial court to conclude that the prosecutor's proffered justifications for excusing the three minority jurors rebutted any prima facie showing of unconstitutional discrimination."
We recognize that we have not answered all of the questions that trial judges, prosecutors, and defense attorneys may have regarding the use of peremptory challenges, but we hope that we have set general guidelines that will aid the bench and bar in complying with constitutional requirements for the exercise of peremptory challenges.
Before more specific guidelines can be established, the bench and bar could consider the more effective use of voir dire in individual cases to screen out possible bias and prejudice on the part of individual jurors. See Spears, Voir Dire: Establishing Minimum Standards to Facilitate the Exercise of Peremptory Challenges, 27 Stanford L.Rev. 1493.
[1] The United States Supreme Court has granted certiorari in Mathews, but apparently not because of concerns about the Seventh Circuit's discussion of the Batson issues. See 56 U.S.L.W. 3036 (July 28, 1987) (discussing the question presented in Mathews).