James Moss was charged with the offenses of harassment and resisting arrest, as a result of an incident which occurred at the Amoco service station on Edgemont Avenue in Montgomery, Alabama. He was found guilty of both offenses in the district court and on each offense was sentenced to 30 days' imprisonment on each offense and fined $161.00 plus court costs. He appealed his convictions to the circuit court, where a trial de novo was held. At trial, the jury found him not guilty on the harassment charge, but guilty of the resisting arrest charge. The trial judge sentenced him to 6 months' imprisonment and fined him $200.00 plus court costs. He appeals.
After the jury was struck in this case, defense counsel made a motion to quash the jury. Defense counsel stated that the prosecutor had used 11 of his 15 peremptory strikes to remove blacks from the jury panel, and he alleged that the prosecutor had used his peremptory strikes in a discriminatory manner. The trial court found that defense counsel had presented a prima facie showing of discrimination under Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and he required the prosecutor to articulate his reasons for striking these jurors. The following quoted portion of the record is relevant to this issue.
"MR. GUY: Judge, that's Mr. P. And Mr. P. was — Number one, he had been cited by the police department. He had someone that was on probation or parole or answered affirmatively to that question. I don't recall which one. He had children between 16 and 20, but the main two reasons were the first two that I noted for you.
"THE COURT: All right. Number 35, which is juror J.B.
"MR. GUY: Again, he was another one who had relatives, family members, or someone on probation or parole. And —
"THE COURT: Anything else?
"MR. GUY: I'm trying to remember, Judge. Let me see. He answered to a number of questions that I — And I can't remember what all they were, but I just didn't — you know, he didn't come across as someone who would be a good juror. But that was the main reason was the probation and parole question.
"MR. CALLAHAM: Your Honor, do we have a chance to respond or do we just respond at the end?
"THE COURT: Why don't I let him go through all of his, and then I'll let you make any response to any of them.
"MR. GUY: Do I need to go into why I think the probation and parole thing is important, Judge?
"THE COURT: Well —
"MR. GUY: I mean, do you want me to at this time?
"THE COURT: Well, you need to do whatever you think is necessary. The way Batson versus Kentucky says is once they've made out a prima facie showing that it's been used — and with 11 strikes of blacks, I think they've gone with their burden. Now, the burden is back on you to articulate race-neutral reasons, whatever they may be. Any reason other than race that you used to make these challenges.
"MR. GUY: Well, for the record, let me go and explain that this defendant was just off or on parole at the time that he was *Page 522 
arrested. I think that evidence very well — may very well come into the case; and I felt that anybody who had a relative or close friend or something that was on probation or parole might be too lenient on that person or have sympathy with that person. So that was the purpose for that question; so I struck those people that had a relative —
"THE COURT: Anyone who answered affirmatively to your voir dire question number —
"MR. GUY: It was number 17, Judge.
"THE COURT: — 17. Does any member of the jury have family members or close relatives who have been on probation or parole?
"MR. GUY: Yes, sir.
"THE COURT: All right. So you answered about J.B. Did we get to number 77, which is F.M.?
"MR. GUY: And he was also one, Judge.
"THE COURT: That answered voir dire —
"MR. GUY: — affirmatively to the probation and parole question.
"THE COURT: All right. Any other reasons? I'm allowing you to put any reasons.
"MR. GUY: Let me see, Judge. Let me make sure. I looked at the thing. But he was also a single, black male, who I thought might empathize with the defendant in this particular situation.
"THE COURT: All right. Number 29 is M.T.
"MR. GUY: M.T. Number 29. Okay. M.T. was cited in response to my question; and again, maybe for the purposes of the record, I better explain. I feel like anybody that's been cited — or in connection with my question — recently with the police to have any contact with them might somehow be antagonistic against them. People, generally, usually feel that there's no good purpose when they're cited. You know, that's been my experience and judgment. They kind of feel animosity toward the police, and I felt like they might be biased or prejudiced, therefore, if they had been cited within the recent past. She was cited, and she was also single — a young, single, black female, which I thought may — since the defendant is a young, single, black male might have some sympathy or empathize with his position is this case.
"THE COURT: All right. Number 62 is B.M.
"MR. GUY: She knew Mr. Moss. She said she was acquainted with him. She went to school with him. That's why I struck her. She was also single.
"THE COURT: Okay. S.M., which is number 22.
"MR. GUY: S.M. Your Honor, S.M., I struck him because when he answered — I never did get what he did. He didn't have very good communication skills. On the juror —
"THE COURT: I think he indicated he worked at Martin's Restaurant.
"MR. GUY: Martin's. Well, see, I never picked that up. But I also noticed that on the occupational list that was provided to us that he didn't show anything on that either, Judge. And he was also, if I remember correctly, a young male, young black male; and I felt he might be sympathetic towards the position of the — But I just remembered that I couldn't understand what he was saying at all when he was answering the question and just did not give a good appearance that he was interested in being a juror.
"THE COURT: All right.
"MR. GUY: Reluctant in answering questions, I should say.
"THE COURT: All right. Thirteen is B.P.
"MR. GUY: Judge, there were two jurors — I'll go ahead and take them up, number 13 and number 27, if that's on here. Are they both on here?
"THE COURT: Twenty-seven will be coming up.
"MR. GUY: Thirteen and 27 were black females that were sitting on the front row. And when you asked the question, does any — my question — my voir dire question number 15 about allowing police officers to *Page 523 
use force when necessary to effectuate a lawful arrest and 16 about okay to strike a police officer, I noticed that they laughed and were acting very sarcastic about that question. And as a result, I felt like they did not take it seriously, and I felt like they would not be fair in hearing the evidence in this case, which is going to involve the use of force.
"THE COURT: All right. Hold on a second. All right. Go ahead.
"MR. GUY: And let me also mention, Judge, Ms. D., number 27, was also single: and I felt like, again, that with the defendant single — She was a black female, single obviously.
"THE COURT: Okay.
"MR. GUY: And I've forgotten which —
"THE COURT: That was 13, B.P. And you've made some response to 27, which was R.D. Now, that takes us to number 16, O.S.
"MR. GUY: Okay. Ms. S. was single. She works at McDonald's and lives in the area. And I asked the question anybody live in that area, Judge, and nobody responded. She did not respond in the affirmative, and she lives very, very close to where this incident happened off Rosa Parks Boulevard. As a matter of fact, I think it's maybe only a couple of blocks. And she didn't even indicate when that question was asked that she lived in that area. So I felt like that being nonresponsive to that question is admitting that she may be hiding something and, in fact, would not be a fair and impartial juror.
"THE COURT: All right. Sixty-three, R.S.
"MR. GUY: Same thing with 63, Judge. He also lived in the area. The record will, but Mr. S. was the one that lived on Rosa Parks Avenue, which is only a couple of blocks away. Ms. S. lived on Gaston Avenue, but she did work at McDonald's, which there's a McDonald's right in that area over there. And that's also right — Gaston Avenue is right in that area. And neither one of them responded affirmatively to that question when I asked it.
"THE COURT: All right.
"MR. GUY: And for the same reasons, I feel like it's important to know the people that live in that area. They'd be familiar with the situation. They might know people in the area and be familiar with the Amoco. And not answering it, I felt like that they may be hiding something and couldn't be fair and impartial if they weren't willing to answer that they lived in the area.
"THE COURT: The last one is D.A.
"MR. GUY: What number is that, Judge?
"THE COURT: Number 12.
"MR. GUY: I know she was a single, black female, and for the same reason I've already reiterated there, I felt like she might be sympathetic towards the [defendant]. I put an x by her name when she answered the question because for some reason — I can't remember now — but she was rather reluctant to answer or didn't have good communication skills when she answered. I wasn't sure — I didn't think she'd make a good juror.
"THE COURT: All right. Anything further on any of them? All right. This was a large panel so —
"MR. GUY: That was the other thing, Judge. We had — What it got down to, we all had basically all females left. Of course, I also struck whites and struck all the people that, as I mentioned, a probation and parole question was involved. I think I struck all the people that had indicated they'd been cited, which involved whites also. I struck a single — I even struck a single, white female. The question in this case is going to involve a — there's going to be just a little more than the law on harassment and resisting arrest because I'm sure there might possibly be a question concerning the — whether or not they had reason to stop the defendant at the time, Judge; and it's going to kind of involve some complex issues of law and also the amount of force. And that was one of my reasons for trying to pick people who had good communication skills or would be able to understand the law as the court would instruct it and be able to apply the law." (R. 34-44)." *Page 524 
After listening to the prosecutor's reasons for striking these jurors, the trial court denied the motion to quash, finding that the prosecutor had not used his peremptory strikes in a discriminatory manner.
When a prosecutor is called on to explain the reasons for the use of his peremptory strikes, he has "the burden of articulating clear, specific, and legitimate reasons for the strikes, which relate to the case, and which are non-discriminatory. . . . When evaluating the reasons, the trial court [has] a duty to reject any explanation that [does] not meet these requirements." Williams v. State, 548 So.2d 501,504 (Ala.Crim.App. 1988).
 " 'In reviewing the trial court's finding that the strikes were nondiscriminatory, we can only reverse if we find that that determination was clearly erroneous.' Williams, 548 So.2d at 504. Accord, Ex parte Branch, 526 So.2d [609] at 624 [(Ala. 1987)]. ' "In a Batson context, the Supreme Court observed that because the trial judge's findings 'largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' Batson, 476 U.S. at 98, n. 21 [106 S.Ct. at 1724 n. 21]." ' Owens v. State, 531 So.2d 22, 23 (Ala.Crim.App. 1988), quoting State v. Antwine, 743 S.W.2d 51, 66
(Mo. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). 'In reviewing the lower court's ruling, we [are] mindful that it is not our function to decide this issue de novo, to "duplicate the role of the lower court." ' Owens, 531 So.2d at 24. The finding of the trial judge 'is entitled to considerable deference on appeal.' Harrell [v. State], 555 So.2d [263] at 267 [(Ala. 1989)]."
Warner v. State, [Ms. 3 Div. 945, February 23, 1990], 1990 WL 44302 (Ala.Crim.App. 1990).
With these precepts in mind, we are convinced that the trial judge's decision in this regard was "clearly erroneous." We do not have a problem with the prosecutor's explanations of his reasons for striking Jurors P., J.B., and F.M. The prosecutor stated that the main reason he struck these jurors was because they had family members who had been on probation or parole and he believed that evidence to the effect that the appellant was "just off or on parole" at the time of this offense might be admitted at trial. This is a specific and legitimate reason for striking these jurors, and the reason is clearly related to the facts of the case. See Lynn v. State, 543 So.2d 704
(Ala.Crim.App. 1987), aff'd, 543 So.2d 709 (Ala. 1988), cert. denied,493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989); Currin v.State, 535 So.2d 221 (Ala.Crim.App.), cert. denied,535 So.2d 225 (Ala. 1988). Moreover, the fact that the prosecutor struck every person, black and white, who stated that they had a close relation to someone who was, or had been, on probation or parole is further evidence that these strikes were made on race-neutral grounds. Thomas v. State, 555 So.2d 320
(Ala.Crim.App. 1989). The prosecutor's reason for striking Juror B.M. (she went to school with the appellant) was clearly a valid reason for striking her. Nor do we have a problem with the prosecutor's reason for striking Juror M.T. The prosecutor stated that M.T. had recently been given a citation by the police and he wanted to strike people for this reason because they might be "antagonistic" towards the police. "A hostile attitude toward law enforcement or dissatisfaction with the police may justify a peremptory strike." Warner. This is a legitimate reason under the facts of this particular case, because the case involved the alleged harassment of a police officer and because there would be evidence presented that the police used force in effectuating the appellant's arrest after the appellant resisted arrest. Furthermore, the prosecutor struck every person (except one potential juror who was struck by the defendant) who stated that they had been cited by the police recently. As we said before, the fact that the prosecutor struck both blacks and whites for the same reason is relevant to the determination as to whether the prosecutor's stated reason was race-neutral. Thomas. This reason was valid. *Page 525 
However, we have serious misgivings with regard to the legitimacy of the reasons given by the prosecutor for striking the other six black jurors. The prosecutor stated that one of the reasons he struck Juror D.A. was because she did not have "good communication skills." While "physical or mental impairments or disabilities of a veniremember may justify a strike," Warner, this assertion by the prosecutor is not supported by the record. The only time D.A. spoke during voir dire was when she was asked to stand up when her name was called and to respond by telling where she worked and whether she was married. At the appropriate time, when her name was called, D.A. stated, "United States Postal Service. I'm not married." There is absolutely no evidence in the record, nor did the prosecutor offer any evidence, as to why he believed this juror did not have "good communication skills." Clearly, this was not a race-neutral reason. The only other reason given by the prosecutor for striking D.A. was that "she was a single, black female" and "I felt like she might be sympathetic towards the [defendant]."
 "In Matthews v. State, 534 So.2d 1129
(Ala.Crim.App.), cert. denied (Ala. 1988), the prosecutor struck several potential black jurors because they were single. In Matthews, we stated that the reason given by the prosecutor would not automatically be a race-neutral reason in any given case, but we found this reason to be race-neutral because non-black jurors were also struck because they were single."
Thomas, 555 So.2d at 322. This case presents a very different scenario. Here, the prosecutor struck four single, black females. In the prosecutor's words, "I even struck a single, white female." However, it also appears from the record that this particular single, white female also stated during voir dire that she had a close friend on probation or parole and that she had been cited recently by the police. These two things were the reasons the prosecutor stated he had struck other jurors. Thus, the reason for striking this juror could have been for these reasons rather than because she was single. Furthermore, the record shows that at least three single females remained on the jury. We are unable to ascertain the race of these jurors from the record, although the appellant alleges in his brief that they were white. If all of these jurors were indeed white, then it is clear that the prosecutor's reason for striking D.A. was not race-neutral because he struck all single, black females but did not strike any (except for the juror discussed above) single, white jurors. Even if all three of these jurors were black, it would not affect our decision that this reason given by the prosecutor for striking Juror D.A. was not race-neutral. If the prosecutor left three single, black jurors on the jury panel, his explanation that single, black females would "be sympathetic" to the appellant would not be valid.
We also find that the prosecutor failed to give race-neutral reasons for striking Juror S.M. The prosecutor said that he struck S.M. because he did not "have very good communication skills. As with Juror D.A., the only time S.M. said anything during voir dire was when he was asked where he was employed and if he was married. S.M. responded, "I work for Martin's Restaurant, and I'm not married." The court reporter obviously had no trouble understanding S.M. and neither did the trial judge, since he was able to recall where S.M. worked. The prosecutor also said that he struck S.M. because he was a "young, black male . . . and I felt he might be sympathetic towards the position of the [appellant]." There is no indication in the record as to whether the prosecutor also struck young, white males and as to why a young male (black or white) would be sympathetic towards the appellant.
The prosecutor stated that he struck Jurors O.S. and R.S. because they failed to respond by stating that they lived in the area where this incident occurred and that because of this they "may be hiding something" (we note that O.S. was also struck because she was single).
 "This Court recognizes that 'parties have a right to have questions answered truthfully by prospective jurors to enable *Page 526 
wise and informed exercise of their peremptory strikes and that when jurors fail to answer questions correctly, the parties are denied the exercise of that right.' Parish v. State, 480 So.2d 29, 30 (Ala.Crim.App. 1985). However, '[u]nless a juror is asked a question which applies to him in a manner demanding response, it is permissible for a juror to remain silent; the juror is under no duty to disclose."
Clark v. State, 562 So.2d 620 (Ala.Crim.App. 1989). We are not convinced that the trial court's question to the venire concerning whether any of the jurors lived in the area where this incident took place was definite enough (as to the area) to put these jurors on notice that they should respond to this question. While this reason "might pass muster under some circumstances; but, when considered along with the other reasons given in the instant case, it is highly suspect."[1]Williams, 548 So.2d at 507.
Likewise, we are suspicious of the prosecutor's reasons for striking Jurors R.D. and B.P. These two jurors were struck because they allegedly laughed at one of the prosecutor's questions (Juror R.D. was also struck because she was a single, black female). While this may be a valid reason under some circumstances, we doubt its legitimacy, when it is considered together with the other reasons that were given by the prosecutor in this case. Williams.
Although four blacks sat on the jury in this case,
 " '[i]t is important to emphasize, as [the court] did in United States v. David, 803 F.2d 1567, 1571
(11th Cir. 1986), that under Batson, the striking of a single black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when there are valid reasons for the striking of some black jurors.' "
Owens v. State, 531 So.2d 22, 26 (Ala.Crim.App. 1987). In the case at bar, several black jurors were obviously struck for reasons which violated Batson and Branch.
 "We, therefore, find that the trial court's determination that the [prosecutor's] explanations were sufficient to overcome the presumption of discrimination and that his explanations were 'race-neutral' fails to meet the requirements of Batson v. Kentucky and Ex parte Branch, as herein cited. The determinations of the trial court are clearly erroneous."
Madison v. State, 545 So.2d 94, 99 (Ala.Crim.App. 1987).
The appellant is entitled to a new trial. Therefore, this case is reversed and remanded to the trial court. Since this case must be reversed for a new trial, we pre-termit consideration of the other issues raised on appeal.
REVERSED AND REMANDED.
All the Judges concur.
[1] We must also note that if these two jurors had affirmatively responded that they lived in the area where this incident occurred, the bias of these witnesses because of their residence would have had to have been shown by further voir dire. Williams v. State, 548 So.2d 501 (Ala.Crim.App. 1988).