ON RETURN TO REMAND
This cause was remanded to the trial court in order for a hearing to be held to determine whether a yellow legal pad, which had been in the possession of the police department and possibly contained exculpatory material, existed,575 So.2d 1198 (1990). If the pad was no longer in existence, then the trial court was to determine whether the pad was disposed of as a result of negligence or of intentional conduct or bad faith by the police department. If the yellow legal pad's disposal was a result of intentional conduct or bad faith, then the appellant's rights to due process were violated and he was entitled to a new trial. Ex parte Dickerson,517 So.2d 628 (Ala. 1987); Arizona v. Youngblood, 488 U.S. 51,109 S.Ct. 333, 102 L.Ed.2d 281 (1988). If the yellow pad was located, the trial court was to determine whether the information therein concerning the darkcolored Trans Am automobile was exculpatory. If so, the appellant's rights to due process were violated and he is entitled to a new trial. If the trial court found that the information contained in the yellow legal pad was not exculpatory, the trial court was to return its findings of fact, along with the yellow legal pad, to this court. The trial court's findings of fact and conclusions of law concerning this matter, along with a transcript of the hearing, were to be returned to this court, regardless of the trial court's determination.
If the trial court determined that the appellant was not entitled to a new trial, a further hearing was to be held pursuant to Ex parte Branch, 526 So.2d 609
(1987),[1] in which the prosecutor was directed to come forward with racially neutral reasons for his peremptory strikes of black veniremembers.
A two-day hearing was initially conducted on remand; however, after the State objected that certain evidence was excluded, a second hearing was held several weeks later. Thereafter, the trial court determined that the yellow legal pad did exist and that it contained no exculpatory material. Because the appellant was not entitled to a new trial on that ground, the prosecution was instructed to come forward with race-neutral reasons for its peremptory strikes of black veniremembers. The trial court determined that the State's reasons were race neutral.
 I
The State argues that the testimony presented during the hearing on remand *Page 1306 
indicates that the entire yellow legal pad exists. In the alternative, the State argues that any loss can be attributed only to mistake or negligence and not to bad faith, and because the entire body of information received by the dispatchers and partially recorded on the yellow legal pad is contained on dispatchers' tapes, which the State turned over prior to this hearing, any error would be harmless.
At the hearing, one of the prosecutors testified that, subsequent to the remand order, he discovered among his trial materials seven yellow legal-sized pages, which contained references to a Trans Am or a "Trans Am-like" vehicle. The entries were dated October 16 and 17, 1987. The prosecutor testified that he did not remember seeing these pages previously. These pages were identified by witnesses who had testified at trial, who testified at the hearing that these were the pages to which they had referred. However, the appellant argued that these pages were only a part of the entire yellow legal pad, because there had been testimony that entries of the type contained on the pages had been made over the course of several weeks, and all of the entries contained on these pages were dated as having been received on only two days. However, the trial court also received into evidence tapes that included all of the telephone calls received by the state trooper radio dispatcher's office during this period. The State also presented a log of telephone calls that had been received by the investigative headquarters, maintained by Alabama Bureau of Investigation officials during the initial investigation into this murder. Tapes of calls made to this telephone line were introduced into evidence. The State attorneys sought to "weed out" the telephone calls that did not directly relate to information concerning a Trans Am or a "Trans Am-like" car and to exclude the other telephone calls as investigative work product. However, the trial court ordered the tapes in their entirety and the logs to be turned over to the appellant and the trial court.
During the hearings, testimony was introduced by the defendant from witnesses he had gotten as a result of certain of excerpts from the tapes and during the second hearing the State introduced witnesses to explain some of these excerpts.
We conclude that if any error existed in the trial court's determination that the entire yellow legal pad existed, it was harmless, in light of the introduction of the tapes of the recorded telephone calls, which included more information than that on the yellow legal pad. Rule 45, Ala.R.App.P. Moreover, a review of all of the evidence presented during the hearings reveals that the trial court's determination that no exculpatory evidence was contained in those pages of the yellow legal pad produced was proper. The excerpts that tended in any way to connect the Trans Am or the "Trans Am-like" vehicle to the victim were too tenuous to be relevant.[2] The fact that the appellant was not privy to this information before or during trial could have in no way prejudiced his defense.
 "It is well settled that the government has the obligation to turn over the evidence in its possession that is both favorable to the accused and material to guilt or punishment. United States v. Agurs, 427 U.S. 97 [96 S.Ct. 2392, 49 L.Ed.2d 342] (1976); Brady v. Maryland, [373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963)]. Although courts have used different terminologies to define 'materiality,' a majority of this Court has agreed, '[e]vidence is material only if *Page 1307 
there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' United States v. Bagley, 473 U.S. [667], at 682 [105 S.Ct. 3375, 3383, 87 L.Ed.2d 481] (opinion of BLACKMUN, J.); see id., at 685 [105 S.Ct. at 3384] (opinion of WHITE, J.)."
Pennsylvania v. Ritchie, 480 U.S. 39, 57,107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987).
In the present case, the evidence was not material in that, as it was irrelevant to the facts and evidence of the murder, even if disclosed to the defense, the result of these proceedings would not have been different. Therefore, the trial court properly concluded that the appellant was not entitled to a new trial and that his due process rights had not been violated.
 II
This matter was further remanded for the prosecutor to come forward with racially neutral reasons for his strikes of black veniremembers. The record indicates that the State used 23[3]
of its 29 peremptory strikes against black veniremembers. While some of the reasons provided by the prosecutor were sufficiently race neutral, a number of his reasons were highly suspect. Moreover, while certain of these suspect reasons were in addition to race-neutral reasons, and therefore did not require a reversal, Battle v. State, 574 So.2d 943,949 (Ala.Cr.App. 1990), in certain instances, the only reasons given for striking veniremembers were suspect and improper under the mandates of Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and Ex parteBird, 594 So.2d 676 (Ala. 1991).
A black female was struck because she lived in an area close to the crime scene. Another black female was struck because she lived in an area close to the crime scene and because the chief deputy district attorney knew her family and knew that her family had a bad reputation with law enforcement. This latter potential juror had also indicated opposition to the death penalty.[4] These two potential jurors were the only veniremembers struck because they lived near the crime scene. During the hearing, the prosecutor stated the reasons for the strike of one of these potential jurors as follows:
 "My fourteenth strike was juror number one. . . . [S]he is a black female. She lived in Sardis, which was in effect within five miles of the crime scene. That was the route that the alleged black Trans Am was supposed to have gone; also the route that Joe Duncan was supposed to have gone to meet Liz Cobb down at the church on County Road 6. That we knew that Joe Duncan's coverup route that he went in the early morning hours went through the Sardis area; in fact, turned right at the blinking light — or turn left, coming from Selma. And we knew that was going to be discussed; and in fact was drawn out on a map. And for those reasons we struck everyone from that area."
Thereafter, when the defense counsel questioned this prosecutor concerning this strike, the following transpired:
 "Q. Now, if I understood your testimony, she was struck because she lived in Sardis?
"A. Yes, sir.
 "Q. Did you raise any question — is she a black or white person?
"A. She's a black female.
 "Q. Did you raise any questions on voir dire as to whether or not people living in the Sardis area knew anything of the scene? *Page 1308 
"A. No, I did not.
 "Q. Did you raise any question on voir dire that would indicate that people who lived in Sardis might have any more information than people not living in Sardis?
 "A. I knew that was the route that Joe Duncan went that night; but, no, as to whether the people in Sardis knew more, no.
"Q. So you just struck everybody from Sardis?
"A. That's correct.
"Q. Is Sardis predominantly black?
"A. [Defense counsel], I honestly don't know.
"Q. You really don't?
"A. I would think its probably pretty close.
"Q. Pretty close to what?
"A. Pretty close to split.
 "Q. Now you don't have any idea, looking at your notes, how many folks from Sardis you struck because they were from Sardis?
"A. I think there was one. . . .
"Q. Just one?
"A. Yes.
 "Q. Well, if that's the case, everybody you struck from Sardis was black?
"A. The only one I struck, yes, sir.
 "Q. Well, did you strike everybody who was from Minter?
 "A. I think there was only one and, yes, I struck her. That's the information I got from Ed, yes, sir.
 "Q. Did you — I thought you testified earlier that you struck everybody who came from those two areas?
"A. That's right.
 "Q. Did you know whether Minter is predominantly black?
"A. I think Minter is predominantly black.
 "Q. Did you raise any questions on voir dire as to whether these people in Minter had some peculiar knowledge about this case by reason of living in Minter that other folk would not have in other parts of the county?
 "A. I know that [potential juror] was asked what she knew about it and she said she didn't know anything, and then she started saying she had seen people in the area.
 "Q. Did you strike anybody else because they were from Minter?
"A. I don't think so."
The record indicates that there was no questioning of the venire panel concerning any knowledge that the members may have of this case because they lived in areas close to the crime scene. Moreover, the record is unclear as to how living close to the crime scene may have affected a juror's ability to hear this case.
In Moss v. City of Montgomery, 588 So.2d 520
(Ala.Cr.App. 1991), this court determined that the trial court was "clearly erroneous" in holding that the prosecutor's reasons for his peremptory challenges were race neutral. In that case, the following reason was given by the prosecutor for the strikes of two potential jurors:
 "[PROSECUTOR]: Okay. Ms. S. was single. She works at McDonald's and lives in the area and I asked the question, 'Anybody live in that area?' Judge, and nobody responded. She did not respond in the affirmative, and she lives very, very close to where this incident happened off Rosa Parks Boulevard. As a matter of fact, I think it's maybe only a couple of blocks. And she didn't even indicate when that question was asked that she lived in that area. So I felt like that being nonresponsive to that question is admitting that she may be hiding something and, in fact, would not be a fair and impartial juror.
"THE COURT: All right. Sixty-three, R.S.
 "[PROSECUTOR]: Same thing with 63, Judge. He also lived in that area. The record will, but Mr. S. was the one that lived on Rosa Parks Avenue, which is only a couple of blocks away. Ms. S. lived on Gaston Avenue, but she did work at McDonald's, which there's a McDonald's right in that area over there. And that's also right — Gaston Avenue is right in that area. And neither one of them responded affirmatively to that question when I asked it. *Page 1309 
"THE COURT: All right.
 "[PROSECUTOR]: And for the same reasons, I feel like it's important to know the people that live in that area. They'd be familiar with the situation. They might know people in the area and be familiar with the Amoco [gasoline service station]. And not answering it, I felt like that they may be hiding something and couldn't be fair and impartial if they weren't willing to answer that they lived in the area."
This court held that this reason given by the prosecutor was not racially neutral, holding that jurors are not under a duty to disclose unless asked a question in a manner demanding a response. This court stated in a footnote:
 "1. We must also note that if these two jurors had affirmatively responded that they lived in the area where this incident occurred, the bias of these witnesses because of their residence would have had to have been shown by further voir dire. Williams v. State, 548 So.2d 501
(Ala.Crim.App. 1988)."
Id., 588 So.2d at 526.
In Williams v. State, 548 So.2d 501 (Ala.Cr.App. 1988), this court stated that, where veniremembers are struck based on their association with a group, from which the prosecutor infers a bias, examination by the prosecutor during voir dire should establish that such a bias in fact exists. "That these persons were challenged without being examined on voir dire in reference to any possible bias they might have . . . raises a strong inference that they were excluded on the basis of race alone. A like rationale supports our rejection of age-based bias and residence-based bias under the facts here."Id. at 507.
 "Although there was a lengthy voir dire of the venire in this case, the prosecutor did not ask any questions about the relationships made the basis for his peremptory strikes of [certain] veniremembers. . . . The prosecutor's stated basis for his information concerning the various relationships of the veniremembers is vague and suspect. . . .
 "The importance of a thorough voir dire has repeatedly been stressed by the appellate courts of this state. See, e.g., Jackson v. State, 557 So.2d 855, 857 (Ala.Cr.App. 1990) ('We reiterate that the fact that the black jurors who were challenged without being examined on voir dire in reference to possible bias because of their employment, position in society, age, and residence raises a strong inference that they were excluded on the basis of race alone.') Here, the total lack of questioning to the challenged veniremembers concerning the basis for their challenges is fatal."
Guthrie v. State, 598 So.2d 1013, 1020 (Ala.Cr.App. 1991), cert. denied, 598 So.2d 1020 (Ala. 1992).
Although even one improperly motivated strike is sufficient to require a reversal, Williams v. State,548 So.2d 501, 507 (Ala.Cr.App. 1988), cert. denied, 489 U.S. 1028,109 S.Ct. 1159, 103 L.Ed.2d 218 (1989), we note that two other reasons given by the prosecutor for striking potential jurors were highly suspect. The record indicates that one potential black juror was struck because the prosecutor stated that he was known to have had problems making child support payments and the prosecutor felt that, because the instant case would involve testimony about the appellant's failed marriages and lack of financial stability, the potential juror might be biased. The prosecutor gave the following reason for striking this potential juror:
 "My eighteenth strike was. . . . juror number 34. He is a black male. [Number 34] had paid child support through the District Attorney's Office. We knew that he had had problems with his payments. One of the issues in the case that we expected to bring up was Joe Duncan's failed marriages; whether it was two, whether it was three. And also his lack of finances. We knew and we called to the stand Ramsey Knight, who is a banking official with SouthTrust Bank who was going to testify that Joe Duncan was in effect given one loan after being asked for that to happen by Captain George Jones, who is now Major Jones. And then he was denied a second bank loan because of his zero net worth. For those reasons he was struck." *Page 1310 
During cross-examination of the prosecutor, the defense counsel asked the following questions:
 "Q. Now, your eighteenth strike, [Prosecutor], that was [Number 34]?
"A. Yes, sir.
". . . .
"Q. Now, this is a black male?
"A. Yes, sir.
 "Q. And you struck him because he had had some problems with child support?
"A. That's correct.
 "Q. Do you know whether any white jurors had problems with child support?
 "A. Not that I'm aware of. I know on this juror that he had paid it through our office and we had information that he had in effect — we had problems with his payments. We also knew the issue was to be involved about Duncan's payments.
"Q. But did you voir dire the venire —
"A. On child support?
"Q. Yes.
"A. I don't think so.
 "Q. So there may well have been whites on there that had problems with child support?
"A. May have been.
"Q. You didn't inquire into that though, did you?
"A. Didn't inquire of anybody.
 "Q. Well, if — if, [prosecutor], if child support problems are significant enough to justify striking a person from the jury, explain why you didn't voir dire other jurors on that significant issue?
 "A. [Defense counsel], maybe I should have in effect asked the venire about child support. I got the information I needed about this one that was already here before we even started striking.
 "Q. The question, [prosecutor], is not about that one juror. The question is, if the principle of child support is significant for striking of a juror, why didn't you voir dire the whole venire on the question and just struck one black man?
 "A. [Defense counsel], in hindsight, if I had had to do my questions in the voir dire again, I probably would have asked a lot more questions.
"Q. About child support?
 "A. About other things, and probably including child support."
Although the fact that child support proceedings were brought against a juror has been held as a sufficiently race-neutral reason for the exercise of a peremptory strike against a juror,Heard v. State, 584 So.2d 556, 560 (Ala.Cr.App. 1991), the reason for striking this juror, in the present case, was related to Joe Duncan's financial state at the time of the offense. However, there was no evidence that Joe Duncan was paying child support, or having difficulty paying child support, or that this potential juror was the only juror who was having trouble paying child support. Thus, we find this reason to be improper.
Another allegedly group-based strike which, under the facts of this case, was suspect, involved a potential juror who had indicated that she was separated. The prosecutor gave his reasons for the strike of this potential veniremember as follows:
 "My nineteenth strike was juror number 33 . . . and she is a black female. She stated that she was separated. She was the only juror that mentioned to us that she was separated. The others mentioned that they were divorced, widow, widower, married or single. We knew that Duncan's marriage failure was an issue. And we didn't want — and she made it a point to let us know that she was separated. And because of that, and the way the relationship allegedly began between Joe Duncan and Liz Cobb while Joe Duncan was married, we struck her."
That a separated female would be biased in a case where the appellant was having an extramarital affair and then divorced is highly speculative, and, without any further voir dire questioning to reveal any bias, is a highly suspect reason.
In Ex parte Branch, 526 So.2d 609 (Ala. 1987), the Alabama Supreme Court set out certain guidelines that could be used in evaluating whether a prosecutor's reason for an otherwise discriminatory strike was valid or sham. Some of the guidelines included: that the reasons were not related to the facts of the instant case; that the *Page 1311 
record demonstrated a lack of meaningful questions to the challenged juror; and that " 'an explanation [is] based on a group bias where the group trait is not shown to apply to the challenged juror specifically.' " Id. at 624, quotingSlappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App. 1987), affirmed, 522 So.2d 18 (Fla. 1988), cert. denied,487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988).
 "This Court is acutely aware of the fact that an appellate court may reverse a trial judge's determination that the prosecution's peremptory challenges were not motivated by intentional discrimination only if that determination is clearly erroneous. Branch, 526 So.2d at 625. Yet, if Batson and Branch
are to have any meaning, this Court must reverse where its independent review convinces it that a clear abuse of discretion is present. Our Supreme Court has warned that '[i]n determining whether the evidence is sufficient to create an inference of discrimination . . . [t]he trial court must use its discretion in weighing this kind of fact question, but this discretion must be tempered by a concern for the defendant's right to equal protection of the laws.' Harrell [v. State], 555 So.2d [263,] 268 [(Ala. 1989)].
 " 'Trial courts should not require a strict or rigid quantum of proof by the defendant of the Batson elements. Rather, out of a concern for equal protection and justice under the law, trial courts must be sensitive to the defendant's Batson claims, and should not lightly brush them aside. Batson
demands that, in deciding whether the defendant has carried his burden of proving a prima facie case, the trial court "must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " Batson, 476 U.S. at 93
[106 S.Ct. at 1721].' Harrell, 555 So.2d at 268.
 " 'The trial judge cannot merely accept the specific reasons given by the prosecutor at face value.' Branch, 526 So.2d at 624.
 "Here, the State failed to carry its 'burden of articulating a clear, specific, and legitimate reason for the challenge which relate[d] to the particular case to be tried, and which is nondiscriminatory.' Branch, 526 So.2d at 623 (emphasis in [Branch]). '[T]he removal of even one juror for a discriminatory reason is a violation of the equal protection rights of both the excluded juror and the minority defendant.' Harrell, 555 So.2d at 267.
 "In 1988, the Alabama Supreme Court in Branch, 526 So.2d at 621-26, established 'some general guidelines' for courts to follow in implementing the command of the United States Supreme Court in Batson. Both the letter and the spirit of those guidelines and that command must be satisfied in every case. Because they were not in this particular case, the judgment of the circuit court is reversed."
Parker v. State, 568 So.2d 335, 338 (Ala.Cr.App. 1990).
Based on the aforementioned "highly suspect reasons" given by the prosecutor for its strikes of these potential jurors, and in light of the particular facts and circumstances of this case, we conclude that these reasons did not satisfy the requirements and guidelines set forth in Batson v.Kentucky, supra, and Ex parte Bird, supra, and, therefore, we find the trial court's determination that the reasons provided by the prosecutor were race neutral to be "clearly erroneous."
REVERSED AND REMANDED.
All Judges concur with BOWEN, J., concurring specially without opinion.
MONTIEL, J., recuses.
[1] This case predates Powers v. Ohio, ___ U.S. ___,111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). However, that holding applies to the instant case. Guthrie v. State,598 So.2d 1013 (Ala.Cr.App. 1991), cert. denied, 598 So.2d 1020
(Ala. 1992).
[2] There was testimony concerning one of the excerpts from a witness-caller that he had observed a "Trans Am-like" vehicle drive past the victim's trailer, stop there, and drive by again, following the offense. There was also evidence that one of the telephone calls came from the sheriff of Sumter County, who reported that a driver of a dark Camaro had threatened deputies in that county that he would kill anyone who attempted to stop him; specifically "that if [the deputy sheriff] tried to stop him he wouldn't be making any other stops." There was also information that this driver had outrun the troopers in Sumter County approximately one month prior to the telephone call. Another excerpt indicated that a man named "Lou" had shot the trooper, who had been dealing in drugs, and that Lou was seen driving a yellow or white Volkswagen. However, this latter information was traced to its origin and determined to have come from "boys who were 'running off at the mouth' ".
[3] Although the prosecutor addressed 24 of his peremptory strikes, giving reasons, the record indicates that the prosecutor mistakenly believed that his seventh strike was against a black veniremember. The strike list contained in the record indicates that this veniremember was white.
[4] See Currin v. State, 535 So.2d 221, 223
(Ala.Cr.App. 1988), cert. denied, 535 So.2d 225 (Ala. 1988) (wherein this court held as sufficient the prosecutor's reason for the strike of potential juror that "law enforcement recommended to strike, did not like being a witness in another case, lives in general area of crime and knows about it but did not reveal such knowledge.") *Page 1312